IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

```
JOHN DOE,                          )
                                   )
   PLAINTIFF,                      )     CASE NO. 2:19-CV-01054
                                   )
        vs.                        )
                                   )
THE OHIO STATE UNIVERSITY,         )
ET AL.,                            )
                                   )
   DEFENDANTS.                     )
_____)
```

***SEALED***
TRANSCRIPT OF ***TEMPORARY RESTRAINING ORDER PROCEEDINGS***
BEFORE THE HONORABLE EDMUND A. SARGUS, JR.,
UNITED STATES DISTRICT JUDGE
MARCH 25, 2019; 1:30 P.M.
COLUMBUS, OHIO

APPEARANCES:

FOR THE PLAINTIFF:

WARSHAW BURSTEIN LLP
By: KIMBERLY C. LAU, ESQ.
555 Fifth Avenue
New York, New York 10017

THE ROSENBERG LAW OFFICE LPA
By: ERIC J. ROSENBERG, ESQ.
395 North Pearl Street
Granville, Ohio 43023

FOR THE DEFENDANT:

OHIO ATTORNEY GENERAL EDUCATION SECTION
By: TODD R. MARTI, ESQ.
MIA M. YANIKO, ESQ.
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
- - -

Proceedings recorded by mechanical stenography,
transcript produced by computer.

2

1          MONDAY AFTERNOON SESSION

2            MARCH 25, 2019

3               - - -

4        THE CLERK:  This is a TRO hearing for March 25, 2019,

5    john Doe vs. The Ohio State University, et al.  This hearing is

6    sealed.

7        THE COURT:  Counsel, good afternoon to all of you.  As

8    you know, this matter was filed just a few days ago and

9    scheduled for an emergency hearing.  And, again, to be clear,

10   this is on the temporary restraining order, not on the

11   preliminary injunction.  I think you all understand that.

12       There's been some briefing and there's been some

13   exchange of information, and then the rest is set for a hearing

14   today.

15       I don't normally do this, but because we're on an

16   expedited basis and everybody's time is short, I want to focus

17   in on what I see as the issues here, and I'll hear from you if

18   you disagree.

19       There are a few factual disputes, it would appear to me.

20       The first has to do with what did the electronic

21   application for transfer say.  There appears to be some factual

22   dispute as to that issue, and that may have to be resolved with

23   testimony.

24       The other is what was the precise date that Mr. Doe was

25   notified of a complaint filed against him and what was the

3

1    chain, in other words, of the timeline that would indicate

2    notification leading up to his application for admission as a

3    transfer student.

4         Does either side see any additional factual disputes

5    that I've not mentioned?

6         MR. MARTI:  Not from the defendants, Your Honor.

7         THE COURT:  Thank you.

8         MS. LAU:  Well, Your Honor, just a small

9    clarification.

10        When you say the factual dispute is the precise date of

11   when Doe was notified of the complaint filed against him, are

12   you --

13        THE COURT:  Well, that's one of the issues.

14        MS. LAU:  Are you referring to the charge?

15        THE COURT:  I don't see that anywhere in the pleadings

16   as to an admission date as to when he would have known so I

17   assume we either have a stipulation to that or it has to be

18   proven up.

19        MS. LAU:  Right.  So we would just maybe use a

20   different wording of that because I believe at issue for

21   Ohio State was whether he was notified of a charge.

22        THE COURT:  Well, we're going to get into that.  I

23   understand there's a dispute as to what that word means and

24   that's going to be one of the -- I would put that in the

25   category of legal issue.  We don't need testimony on that, but

4

1     I don't want to assume you have an agreement on that.

2          You would agree with that, right?

3               MS. LAU:  That's correct.

4               THE COURT:  That's a disputed word as we start this.

5               MS. LAU:  Yes.

6               THE COURT:  But it won't be informed by anybody's

7     testimony.

8               MS. LAU:  Right.

9               THE COURT:  Very good.

10         So let's talk about procedure for a moment.

11         The plaintiff has filed an affidavit in connection with

12    the application for the temporary restraining order.  You can

13    stand on that, if you wish.  You can add additional testimony

14    on the plaintiff's side, or you can wait for rebuttal.  I'll

15    leave that to the plaintiff in the first instance.

16         How would you like to proceed?

17              MS. LAU:  Your Honor, we would like to offer testimony

18    by Mr. Doe.

19              THE COURT:  Mr. Marti, you don't object if the

20    plaintiff goes first, do you?

21              MR. MARTI:  No, not at all, Your Honor.

22              THE COURT:  Ms. Lau, you may call the witness, and

23    we'll proceed.

24         (Witness sworn.)

25              THE COURT:  Ms. Lau, when you're ready, you may

5

1    proceed.

2          MS. LAU:   Thank you, Your Honor.

3                        -  -  -

4                      JOHN DOE

5    Called as a witness on behalf of the Plaintiff,

6    being first duly sworn, testified as follows:

7                  DIRECT EXAMINATION

8    BY MS. LAU:

9    Q.   Mr. Doe, when did you begin pursuing studies at

10   Ohio State University?

11   A.   I first enrolled at Ohio State in the fall of 2017,

12   which would be August.

13   Q.   And what degree were you pursuing?

14   A.   I'm pursuing an aeronautical and astronautical

15   engineering degree while also pursuing a minor in nuclear

16   engineering.

17   Q.   And how long is that program?

18   A.   Traditionally, with Ohio State's layout, it would be a

19   four-year plan.  Based on some classes that I had to take

20   specific to Ohio State, I was kind of a sophomore/junior

21   standing when I transferred there so my, I guess, degree would

22   take five years total.

23   Q.   And on what date did you apply to transfer to

24   Ohio State?

25   A.   I applied in June of 2017.

1    Q.    And do you recall what date you were accepted for

2    admission to Ohio State?

3    A.    I don't remember the exact date I was accepted, but it

4    was most likely sometime in July of 2017.

5    Q.    And what school were you transferring from?

6    A.    I transferred from the University of California,

7    Los Angeles.

8    Q.    Why did you decide to transfer from UCLA?

9    A.    There's -- there's several reasons why I was looking to

10   transfer.  At the start of my sophomore year at UCLA, I was

11   having regular meetings with the counselor of engineering --

12   her name was Jan LaBuda -- both individually and with my

13   family.  We basically talked out some issues that I was having

14   with the way I was being taught, the way the faculty was

15   responding to my pleas for help, the price of tuition, what I

16   was getting with that, and then on top of this going into my

17   sophomore year, I suffered a pretty serious arm injury that

18   left me permanently disabled so I couldn't write with my right

19   hand which is my dominant hand for about six to eight months so

20   that really put me behind academically.

21        So those are some of the reasons I was looking to

22   transfer.

23   Q.    And you said you decided -- or started to think about

24   transferring at the beginning of your sophomore year at UCLA?

25   A.    Correct.  I had -- I had many meetings with Jan LaBuda,

1    and I -- it just really wasn't working out for me there both

2    academically and financially.

3        Q.   At the time you applied to transfer to Ohio State

4    University in June of 2017, were you under investigation for

5    Title IX allegations at UCLA?

6        A.   Yes.

7        Q.   Do you have an independent memory of what Ohio State

8    asked you about discipline history on its transfer application

9    back in June of 2017?

10       A.   I do not.

11       Q.   Is there a document or other evidence that would help

12   you remember?

13       A.   Yes.  I do have a screenshot of a text message strand

14   with my counselor/advisor at the time.  His name was

15   Robert Dudley.  That is basically the only thing that I have

16   that would help refresh me on my memory.

17            MS. LAU:  Your Honor, I would like to refer the

18   witness to exhibits in defendant's binder, Exhibit J, and

19   within that exhibit it's labeled attachment 3.

20            THE COURT:  All right.  Thank you.

21        I'm sorry, Ms. Lau, would you repeat the number again?

22            MS. LAU:  Exhibit J.  And within that exhibit, if you

23   flip through its attachment, it's labeled attachment 3.

24            THE COURT:  Thank you.

25            MR. MARTI:  Would that be page I.D. 165?

8

```
1            MS. LAU:  Correct.

2            MR. MARTI:  Thank you.

3            THE COURT:  Okay.  Go ahead.  Thank you.

4     BY MS. LAU:

5     Q.    And, Mr. Doe, is this a screenshot of the questions that

6     you were referring to?

7     A.    Yes.  This was what I would have to imagine logically

8     was the questions I was asked of Ohio State.  It only makes

9     sense to me that I was asking my counselor at the time.  Also

10    this was for Ohio State in quotes would most likely had to have

11    been what I was asked for Ohio State at the time.

12    Q.    Did you only communicate with your advisor Mr. Dudley at

13    the time through text message, or did you communicate with him

14    through other methods?

15    A.    No.  It was not exclusive to text message.  Me and

16    Mr. Dudley regularly had phone conversations, meetings and text

17    messages.  And I guess e-mails you could throw in there.

18    Q.    Mr. Doe, I'm going to refer you to Exhibit C in the

19    binder.  And if you flip to C-1, it's the unredacted version.

20          Does this document look familiar to you?

21    A.    I would say it looks familiar from what we've gotten

22    through this process; however, I have really no way of saying

23    for certain if this is what I filled out because I never saved

24    the application when I filled it out to transfer.

25    Q.    When you filled out your application and submitted the
```

1    application to Ohio State, did you do that online?

2    A.    Yes.

3    Q.    And once you sent the application to Ohio State, you did

4    not retain a copy of that application in your possession?

5    A.    I don't have one in my possession, no.

6         THE COURT:  And, just so I'm clear, should I assume

7    that this is -- this document is being disputed?

8         MS. LAU:  Only to the extent, Your Honor, that we have

9    no way of authenticating it because we didn't have our own copy

10   of it.

11        THE COURT:  In other words, you can make an argument

12   in Mr. Doe's favor here, if you wish, but is it your position

13   that the earlier document, defendant's exhibit at attachment 3,

14   is it your contention that's what he filled out, not this other

15   form.

16        MS. LAU:  Our contention is that it appears to be that

17   way, Your Honor, but we have no way of really contesting the

18   application that Ohio State has submitted in Exhibit C, and so

19   under either document which we'll argue today we will argue

20   both, that the charge issue --

21        THE COURT:  So your first argument is that you're not

22   going to concede that this was filed by John Doe.

23        Is that accurate?

24        MS. LAU:  Correct.

25        THE COURT:  And, even if it were, the language in it,

1    you're claiming, is insufficient for an expulsion.

2            MS. LAU:  Correct.

3            THE COURT:  All right.

4      BY MS. LAU:

5      Q.   Mr. Doe, did you seek assistance from anyone to answer

6    your transfer application at Ohio State University?

7      A.   Yes.  I was in regular contact with my advisor

8    Robert Dudley.  I wanted to make sure that everything that I

9    was filling out for each transfer application and question for

10   those applications was accurate and truthful.

11     Q.   Do you believe you were being truthful at the time you

12   filled out Ohio State's application?

13     A.   Yes, absolutely.

14     Q.   Did you falsify information on your application to

15   Ohio State University?

16     A.   I never falsified any documents I submitted to

17   Ohio State or on the application itself.

18            THE COURT:  Is Mr. Dudley an attorney?

19            THE WITNESS:  Yes.

20            MS. LAU:  Yes.

21            THE COURT:  He would be representing Mr. Doe in other

22   proceedings?

23            MS. LAU:  No longer represents him.  He's former

24   attorney.

25            THE COURT:  But he was at that time.

1          MS. LAU:  Yes, that's correct.

2          THE COURT:  Okay.

3      BY MS. LAU:

4      Q.   And was Mr. Dudley assisting you in any other capacity

5      other than guiding you on the applications?

6      A.   Yes.  Mr. Dudley helped me throughout the UCLA process.

7      My family and I thought it would be best to hire someone with a

8      kind of large judicial background such that I could focus on my

9      school work while I was there and kind of give me the steps

10     through this process, understand the multiple, I mean, I guess,

11     documents related to what I was going through, as well as just

12     kind of get me through this time and help me find a place to go

13     and transfer to.

14     Q.   At the time that you applied to OSU, were you being

15     charged?  Did you believe you were being charged at UCLA for

16     any allegations?

17     A.   No.  At the time I -- at the time I applied to transfer

18     to Ohio State, I was under the belief that I was under

19     investigation and that there was no charges put against me or

20     pending.  The way I see it is that charges are after an

21     investigation is made.

22     Q.   And do you recall Ohio State's application asking you

23     about pending investigations?

24     A.   I cannot sit here and say for certain what I was asked

25     on Ohio State's questioning.  I don't really remember the exact

1  word that was asked of me on the transfer application.

2  Q.   By you don't see the word investigation in either

3  exhibit I've just shown you, correct?

4  A.   Correct.

5  Q.   At the time you applied to Ohio State, did you think to

6  review UCLA's policies to help you fill out the application?

7  A.   I personally did not think that I should review ULCA's

8  multiple policies, procedures or handbooks.  That was another

9  reason I hired an advisor and lawyer at the time.  He was kind

10  of, I guess, the guidance or person that helped me through this

11  process.  He had gotten all the communications I had gotten and

12  was also the person to kind of put it to me in layman's terms

13  what I was -- what I was dealing with.  Nor did I really think

14  that it would be necessary to go through the multiple things at

15  UCLA for a different institution, Ohio State, because

16  Ohio State does have its own definitions of charges, its own

17  procedures and policies.  So I didn't think that one school

18  would be, you know, I guess, applied to a different school's

19  mantra, if that makes sense.

20  Q.   Were you trying to hide the fact that you were under

21  investigation at the time that you were applying to Ohio State

22  University?

23  A.   No.  If anything, I almost resent the idea that I was

24  trying to hide or run from this investigation.  I knew that

25  transferring would not stop the investigation.  I knew that it

1  was still ongoing no matter where I was in the country so the

2  idea that I was hiding or running away from it is not true.  I

3  still participated.  I was just looking to find a place where I

4  could focus on being a student first rather than have this

5  negative stigma and issues looming.

6  Q.  If Ohio State's application had asked you whether you

7  were under investigation for any discipline violations at any

8  school, how would you have responded?

9  A.  I would have responded truthfully again and said yes, I

10  was under investigation.  But that wasn't the question that is

11  proposed in either of those documents that you showed me, and I

12  answered that one truthfully as well because there was no

13  charges pending against me at the time.

14       THE COURT:  I would just say in passing, the decision

15  was made in October of 2017, right?

16       MS. LAU:  Correct.

17       THE COURT:  I don't have the file.  You've not been

18  forthcoming with that.  I'm assuming that file contains a

19  notification to John Doe of when this process started, probably

20  some interim steps.  You're putting me in a bad situation as

21  the trier of fact here when you have evidence that bears on

22  that that I'm unable to see.  I could order it, but I'm asking

23  you first why wouldn't you want me to see that and what

24  inference should I draw if I don't see it?

25       MS. LAU:  We're willing to show you that, Your Honor,

14

1    so we've brought it today to show you that.

2          THE COURT:  All right.

3          MS. LAU:  It's merely because we did not believe that

4    the administrative record was relevant to him answering the

5    question and what he knew at the time, but we are more than

6    willing to show you that today.

7          THE COURT:  All right.  I mean, we can put it under

8    seal; I don't have any problem with that.  But obviously I'm

9    not going to consider something that both sides don't have a

10    chance to examine.

11         MS. LAU:  If we could take a quick recess, we could do

12    that.  We could consult with our adversary and look over it.

13         THE COURT:  All right.  We'll take a 5-minute recess

14    at this time.

15     (Recess taken at 1:38 p.m to 1:45 p.m.)

16         THE COURT:  Ms. Lau, you may continue.  John Doe can

17    come back to the stand.

18         MS. LAU:  Your Honor, before we proceed with this line

19    of questioning and with the document, I would like to make

20    something known for the record.

21      It was very concerning to us to learn in Ohio State

22    University's memorandum of law over the weekend that they for

23    the first time had advised that there was some kind of

24    allegation against Mr. Doe at OSU for Title IX.  That was the

25    first time we've ever heard of this.

1          THE COURT:  To recall, I believe I asked that question

2  in our conference that we had Friday.

3          Mr. Marti, you may recall, I thought we were pretty

4  clear that this was all about what happened at UCLA.  If it's

5  used to just explain how an investigation started, I'll accept

6  it for that.  But you're not intending to pursue any additional

7  allegations, right?

8          MR. MARTI:  No.  It's the context of how we came to

9  discover the problem relating to that.

10          THE COURT:  I'm the trier of fact, there's no jury.  I

11  will take it for that purpose only and nothing else.

12          MS. LAU:  Then we may have to add that as a contested

13  issue of fact as well because we were never made aware of that

14  as the reason for OSU opening its admissions investigation.

15          THE COURT:  Well, if this were a trial with a jury,

16  oftentimes jurors want to know how did this start.  That's what

17  this is for.  It's not for any probative value as to what we're

18  going to try in this case, I can assure you of that.  It's an

19  explanation, is what I would call it.

20          MS. LAU:  As long as it's not an attempt to smear my

21  client.

22          THE COURT:  Well, to be clear, there will be no

23  evidence given on this, is what I'm hearing, so it can't be

24  used that way.  I agree with you.

25          MS. LAU:  Thank you, Your Honor.

```
 1          If I may approach.

 2          THE COURT:  You may.  Approach the courtroom deputy,

 3   if you would.

 4          MS. LAU:  Your Honor, this is the document that you

 5   have requested to see.  This is from -- a document dated

 6   March 10, 2017.  It was issued by UCLA; Jasmine Rush, who

 7   appears to be the dean of students, and was issued to John Doe

 8   notifying him that they were made aware of allegations against

 9   him and that they are opening an investigation.

10          THE COURT:  I'm going to sound a little pushy here,

11   but this is May -- I'm sorry, March 10, and then there was a

12   final decision on October 31.  I'm assuming there are documents

13   in between those two dates.

14          MS. LAU:  Yes, Your Honor, of course.  We thought you

15   wanted to see this document that opened the investigation.

16          THE COURT:  I'm just trying to get the chronology.  I

17   want to know what happened.  That's my simple concern.

18          MS. LAU:  Sure.  Okay.  Your Honor, if I could

19   question Mr. Doe on this first.

20          THE COURT:  You may.  Go ahead.

21          MS. LAU:  Then we might be able to proceed on the

22   others.

23   BY MS. LAU:

24   Q.   So, Mr. Doe, do you have any independent memory of

25   receiving the document you're holding?
```

1    A.    I do remember receiving it.  I don't remember every

2    exact word in it.  One of the main issues throughout this thing

3    was when I applied, at the time that I applied to Ohio State,

4    all communication, letters and documents like these that were

5    sent to me were sent through a UCLA portal.  So I would get an

6    e-mail in my UCLA e-mail address, it would send me to a link, I

7    would log into that link with -- I would log into my link with

8    my student I.D. and my password, and then I would get access to

9    these documents that would expire after 24 hours.

10   Q.    So you were not able to retain a copy of this March 10

11   letter after 24 hours of receiving it from UCLA?

12   A.    Correct.  After opening it and going through it, it

13   would expire after 24 hours.  There's no way to save these or

14   print them.  It was pretty explicit that you were not allowed

15   to have copies of these or save them so I never gave them --

16   the only other person that would see them was my advisor who I

17   gave access to through my information and credentials.

18   Q.    That was Mr. Dudley?

19   A.    Correct.

20   Q.    And, sitting here today, did you understand that you

21   were being charged when you received this March 10, 2017

22   letter?

23   A.    Sitting here today, and even at the time I applied,

24   there's nothing on here that shows me that I'm being charged.

25   There's nothing that says notice of charges.  If anything, it's

18

1    just informing me of an allegation and how it's going to

2    proceed from there.  So, to my knowledge, there's no charges.

3        Q.   Did you ever meet with anyone at UCLA regarding the

4    investigation prior to submitting your application to

5    Ohio State University?

6        A.   Yes.

7        Q.   Who did you meet with?

8        A.   I -- I can't remember her name for certain.  I believe

9    it was Hilary Crocker.  But I don't know how many times.  It

10   was at least once, but I can't say for certain when or how many

11   times or what we talked about.

12       Q.   And was Ms. Crocker the investigator for UCLA, to your

13   knowledge?

14       A.   Yes, until she passed it on.

15       Q.   And did Ms. Crocker ever tell you in any meetings prior

16   to June 22, 2017, that you were being charged with any

17   disciplinary violations?

18       A.   No.  The word charged was never used in any of our

19   meetings.

20       Q.   Did she ever refer to a notice of charge?

21       A.   No.  She would -- there was never a notice of charges or

22   something like that.  She basically outlined the next steps in

23   the process and how the investigation would continue on.

24       Q.   You mentioned that there came a time when Ms. Crocker

25   had to pass on the case, so to speak.  Are you referring to a

1  time when another investigator became involved?

2    A.    Correct.  Per UCLA's policy, it's supposed to conclude

3  in 60 days, I believe.  I believe that time limit was nearly up

4  or was expired.  None of my witnesses had been questioned, I

5  hadn't even gotten my full story out, and I was informed over

6  the summer that she was leaving the university for reasons I

7  don't know and that it was going to be passed on to someone

8  else.

9    Q.    Do you remember the name of the second investigator?

10   A.    Her name was Suzanne Taylor, and I do not believe she

11  was part of UCLA's team.  I think she was for the UC system.

12   Q.    Did there come a time when an investigation report was

13  issued by UCLA?

14   A.    Yeah.  So there was a summary of findings sometime

15  late -- far after the date I applied to Ohio State and which I

16  got the opportunity to respond to, but it was like a summary of

17  findings just from the one investigator and whatever she saw

18  fit to put on there.

19   Q.    And, to your knowledge, was that the end of the process

20  or was there another --

21   A.    No.  So -- I'm sorry.

22   Q.    Or was there more steps to the process thereafter?

23   A.    There were more steps afterwards.  So after this summary

24  of findings is presented, I had the opportunity to contest the

25  false things in it.  Then she passes -- she takes that into

20

1   consideration, and then she passes down what she believes

2   should go to the dean or associate dean, and from there the

3   dean then makes a decision.

4        After the dean makes his decision, you have the right to

5   appeal, which I obviously did, and I was granted my appeal

6   based on a lot of -- a couple of grounds.

7        And then once the appeal process happened, I had an

8   in-person meeting.  And then once it was all said and done,

9   this was in 2018.

10  Q.   And the conclusion of the process came out to what

11  determination?

12  A.   That there was enough evidence to continue forward.

13  Q.   Were you found responsible of Title IX violations in

14  2018?

15  A.   Correct.

16  Q.   And that was the end of the appeal process?

17  A.   That was the end of the appeal process, end of

18  everything.  That was when I was formally, you know, given the

19  charges from UCLA that I would have to serve.

20  Q.   And is there any action pending relating to the decision

21  at UCLA today?

22  A.   Yeah.  I -- I currently am in the process of filing a

23  writ of mandamus in the California court system.  From the time

24  that this has happened until the day I die, I'll retain my

25  innocence because I know what happened and I know that's not

1  the truth, and I'm fairly confident that this will get

2  resolved.  And, I mean, basically this is the whole reason that

3  everything has snowballed.  So once that gets resolved, I

4  should have a lot more clarity.

5  Q.  Were you trying to run away from the -- strike that.

6  Were you -- when you applied to OSU, was it your intent

7  to apply only because there was this pending Title IX

8  investigation against you at UCLA?

9  A.  No.  That was never the case whatsoever.  Like I said

10  earlier, I had been trying to get out of the situation I was in

11  at UCLA for a while way before this was even an idea.  I was

12  very unhappy there.  Like I said, the financial burden, the

13  lack of help, the arm situation.  Everything on top of that,

14  and then this was kind of like -- the investigation was almost

15  the icing on the cake for me.  It just signaled it was time to

16  move on to where I could focus on being a student not in this

17  hostile environment where, you know, there's -- everyone makes

18  their judgments whether it's true or not.  I mean, there's just

19  a stigma about me, and it really is difficult to focus on your

20  schooling and engineering degree with all that hanging over

21  your head.

22  So, no, I never tried to run or hide from anything.  I

23  wanted to apply accurately to Ohio State and I wanted to just

24  be a student again.

25  Q.  So the fact that there was this pending investigation

1  was a factor in your decision to transfer but not the only one?

2  A.  Correct.  I mean, it was way after the idea of

3  transferring even came about.

4  Q.  Okay.  And it was the stigma attached to being accused

5  of Title IX violations that became the reason why --

6  A.  Correct.

7  Q.  -- you decided to transfer to Ohio State, or one of the

8  reasons why?

9  A.  One of the reasons, yeah.  I mean, it's the stigma,

10  the -- it's really difficult to just be a student at that

11  point.  Like, it's -- there's a lot of pressures and burdens.

12  I have to work on all of this investigative process because I

13  want to prove my innocence, but I'm not a lawyer so I have to

14  go through an advisor.  There's just a lot of factors that come

15  into that so that was just one of the reasons after the fact

16  that I wanted to leave.

17  Q.  How did you first learn about Ohio State's investigation

18  about your transfer application?

19  A.  I got an e-mail from a lady under the name Kendra

20  Wiechart.  I don't know if that's exactly how you say her last

21  name.  But she e-mailed me essentially saying that Ohio State

22  is looking into some sort of code called Dishonest Conduct and

23  that she wanted me to meet her in person to explain everything

24  so that was when I first found out about Ohio State's issue

25  with me.

23

1    Q.    Do you remember the month and the year?

2    A.    Yes.  It would be -- the day I met with Kendra was

3    September 12, 2018.

4    Q.    And did you meet with her alone, or did you --

5    A.    She had -- she had a, I want to say, maybe intern or

6    someone who was working to be in the same position or job as

7    her in there.  Her name was Nadia, I don't know her last name.

8    And then I also had my advisor and counsel Mark Hathaway on a

9    conference call with us as I went to the meeting.

10    Q.    Did Ms. Wiechart explain why you were being

11    investigated?

12    A.    Yes.  She made it very clear that the only reason I was

13    being investigated was that there was an online accessible

14    newsletter that had no factual backing behind it but was

15    accessible to the general public, and she put -- told me that

16    is why I was being investigated by Ohio State.  Nothing else.

17    Q.    Did she ever mention that there were OSU students that

18    were making Title IX allegations against you?

19    A.    Never once.  Like, never once did she verbally express

20    that, put that in writing, tell my attorney or myself.  That

21    was never an issue.  The only issue was this news article that

22    she had found online.

23    Q.    And, to your knowledge, what was Ms. Wiechart's title?

24    A.    I believe she was some sort of Title IX coordinator.

25    Q.    There came a time when Ms. Wiechart stopped handling the

24

1  matter, correct?

2     A.   Correct.  I got an e-mail from admissions after I had

3  already met with Ms. Wiechart and then I confirmed with her

4  that this was not a disciplinary issue and that there's nothing

5  disciplinary related to this, and she confirmed that and said

6  that I should focus and solely base my responses to admissions

7  going forward.

8     Q.   And do you recall when OSU's admissions office contacted

9  you?

10     A.   I don't know the exact date, but I know that I was

11  contacted by a person under the name of Jack Miner and then

12  another individual under the name Gail Stephenoff.  They shot

13  me an e-mail and then started a dialogue between them.

14     Q.   If you look at Exhibit D in your binder, does this

15  refresh your recollection as to when you were notified by

16  Mr. Miner at Ohio State University's office for admissions

17  about his investigation?

18     A.   Correct.  This was the first instance I had gotten from

19  admissions people, I guess you could say, that there was some

20  sort of issue, and this was the first, I guess, response I

21  got -- or first letter I got from Ohio State.

22     Q.   Do you recall how many times you responded to requests

23  for information from the admissions office?

24     A.   I believe I responded on three separate occasions fully

25  complying with any and all information requests Ohio State put

25

1   forth towards me.

2   Q.   Did you also provide a signed FERPA release for

3   Ohio State to talk to UCLA?

4   A.   Yes.  Ohio State basically demanded that I sign a FERPA

5   release or they will revoke my admission, which I'm pretty sure

6   in their policies they say they can't.  But they asked me to

7   sign this FERPA release form.  I did with zero restrictions,

8   zero limitations.  I signed it, I gave it to them, and that

9   should give them access to all my documents.  I gave them what

10  they asked for without hindering their process of gathering

11  information.

12  Q.   Did you have the March 10, 2017, letter at the time that

13  the office of admissions started its investigation?

14  A.   No.  Like I said previously, that online portal thing

15  that UCLA used would never allow me to have access to these

16  files.  It wasn't like there was a stack on my desk with UCLA

17  letters and communications.  None of that I had handy.  It all

18  expired.

19       And, not only that, my UCLA e-mail wasn't even

20  accessible anymore so, even if I did have any sort of

21  correspondence, it would be gone.

22       So at the time they asked, I could not produce something

23  that, one, I didn't believe existed; two, I did not have access

24  to.

25  Q.   There came a time when you did come into possession of

1    the March 10, 2017 letter, right?

2      A.   Correct.

3      Q.   How did you get that?

4      A.   I had to -- I actually don't know the exact terminology,

5    but my attorney Mark Hathaway basically was able to get all the

6    documentation from UCLA for me.  I believe I had to sign some

7    sort of document, maybe another FERPA release, to get the

8    documentation to my attorney to which he got to me.

9      Q.   And do you recall whether this document was part of a

10   set of documents called administrative record?  Does that --

11     A.   Yeah.

12     Q.   -- refresh your recollection?

13     A.   Yes.

14     Q.   And this administrative record, was this in relation to

15   your pending lawsuit against UCLA in the courts of California

16   as well?

17     A.   Yes, I believe so.

18     Q.   During OSU's admissions office investigation, why didn't

19   you produce this March 10, 2017 letter?

20     A.   There -- so the admissions office asked for -- basically

21   informed me that they were going to try to take away my

22   admission.  Then they asked for the FERPA release which I gave

23   them, and then they asked for a charge letter.

24          One, I don't know what a charge letter is.  There's no

25   concrete definition of what a charge letter is.  I've never --

27

1    I don't really personally know what that even is to this day.

2    So what I did produce was the day that charges were brought

3    against me, which was October of 2017 after I had already

4    applied to Ohio State University.

5    Q.   So when you finally received possession of this

6    March 10, 2017 letter, you did not believe this was what Ohio

7    State was looking for when it was asking you for a notice of

8    charge?

9    A.   Correct.  Like I mentioned earlier, my idea of a charge

10   is after the investigative process has happened.  Kind of like

11   what I would liken to Law & Order.  You know, there's --

12   there's the investigation, the witness, their findings, yada,

13   yada, yada, that whole process, and then, you know, you pass

14   down okay, you're charged with murder, for example.

15        What they were asking for was a charge letter.  I don't

16   know what a charge letter is, and this March 10 letter had zero

17   title to it.  It was literally a letter informing me of an

18   allegation.  There was no notice of charges, no -- there was no

19   definition behind it.

20   Q.   Were you trying to withhold information from Ohio

21   State's admissions office during its investigation?

22   A.   No.  Like -- like I mentioned before, I signed the FERPA

23   release form with no limitations or restrictions that gives

24   them everything I had access to.  I complied with all their

25   information requests.  I went to their meetings.  I did

1    everything in my power to answer them and didn't withhold

2    anything from them in this process.

3      Q.   Did you direct anyone at UCLA not to speak to anyone at

4    Ohio State University?

5      A.   No.  I spoke with Jasmine Rush.  She basically ran me

6    through the strict UCLA policy that they follow when releasing

7    documentation to other schools.  I told her I did, in fact,

8    sign the FERPA release form and to comply with any of

9    Ohio State's information requests.  And if there was anything

10   else, to please direct those questions to myself.

11     Q.   Did you direct anyone at UCLA not to respond to

12   Ohio State's questions?

13     A.   Never.  I never informed anyone to not respond to

14   anything.

15     Q.   Have you ever been accused of academic dishonestly at

16   any school?

17     A.   No.

18          MR. MARTI:  Objection; relevance.

19          THE COURT:  Well, he's answered it.  I'll let it pass

20   for now.  He's not on trial for that.  I'll note that.

21          Go ahead.

22          THE WITNESS:  No, I have not.  I actually consider

23   myself a pretty solid student.  For the three semesters I've

24   been at Ohio State, two of them I got Dean's List.

25          THE COURT:  Now we're going beyond that.  Let's go

29

1  forward with another question, if we could.

2        MS. LAU:  No more questions for this witness,

3  Your Honor.

4        THE COURT:  Thank you.

5      Mr. Marti, you may cross-examine.

6        MR. MARTI:  Thank you, Your Honor.

7                 - - -

8             CROSS-EXAMINATION

9  BY MR. MARTI:

10  Q.  Mr. Doe, my name is Todd Marti.  I represent the

11  defendants in this case.

12      Could you -- you have the binder in front of you.

13  A.  Yes.

14  Q.  Could you go behind tab E, please?

15      Take a moment and look through it and let me know when

16  you're ready to answer questions about it.

17  A.  Exhibit 6-3?

18  Q.  Yes.

19        THE COURT:  Mr. Marti, I'm not sure I have that.

20        MR. MARTI:  It should be behind tab E, as in Edward.

21        THE COURT:  And it's --

22        MR. MARTI:  Starts with page I.D. 71 and goes through

23  153.

24        THE COURT:  On the CM/ECF number?

25        MR. MARTI:  Correct.

30

```
 1              THE COURT:  All right.  I'm looking at the wrong
 2   number.
 3         This is the answer of the defendant in the state case?
 4   Am I looking at the wrong document?
 5              MR. MARTI:  No.  The one I'm looking -- may I
 6   approach, Your Honor?
 7              THE COURT:  Sure, if you would.  I'm still back at 71
 8   with an answer.
 9         It's all right.  Go ahead.  I'll catch up with you.
10         What are we looking for?
11              MR. MARTI:  Behind tab E.
12              THE COURT:  Right.
13              MR. MARTI:  It starts with page I.D. 71 all the way
14   through 153.
15              THE COURT:  And what is it exactly?
16              MR. MARTI:  Well, I think what the witness will
17   testify is this is something that he submitted to OSU in
18   response to the allegation.
19              THE COURT:  We'll take it up with him.
20         Go ahead.  Proceed.
21   BY MR. MARTI:
22   Q.   Are you ready to answer questions about this?
23   A.   Yes.
24   Q.   What is this document?
25   A.   This is my initial response to Mr. Miner and
```

31

1   Ms. Stephenoff.

2     Q.   Okay.  And then you filed this with OSU then; is that

3   correct?  Submitted it to OSU.

4     A.   I submitted this e-mail with the attachments to

5   Ohio State.

6     Q.   And your lawyers filed it in this case as an exhibit.

7     A.   That, I don't know.

8     Q.   Okay.  If you could go to -- start with -- see on the

9   upper right-hand corner the page numbers?

10    A.   Yes.

11    Q.   If you could take a look at the document that starts at

12  page 73 and goes through 153.

13    A.   Yes.

14    Q.   What is that document?

15    A.   That is the writ of mandamus for my decision at UCLA.

16    Q.   So this is the California lawsuit you were referring to

17  earlier?

18    A.   Correct.

19    Q.   So this was filed on your behalf?

20    A.   Correct.

21    Q.   Okay.  And who filed it on your behalf?

22    A.   Mark Hathaway, my attorney.

23    Q.   Okay.  And did you review it before it was filed?

24    A.   Yes.

25    Q.   Is this a truthful statement of facts?

32

1    A.   Yes.

2    Q.   Okay.  I would like you to go particularly to pages 100

3  and 101 of this document, and take a look once you get -- are

4  you there?

5    A.   Yeah.  100 and 101?

6    Q.   Yes.

7    A.   Yes.

8    Q.   Take a look at starting on paragraph 83 and going

9  through 89.

10    A.   Yes.

11    Q.   Is that an accurate chronology of how things unfolded

12  with the UCLA investigation?

13    A.   From a higher level, yes.

14    Q.   Okay.  Within this same document, could you go to page

15  131, please?

16    A.   Yes.

17    Q.   What is this document?

18    A.   This is a letter of recommendation from my counselor at

19  the time.

20    Q.   Okay.  And who was that?

21    A.   Robert Dudley.

22    Q.   He's the lawyer who represented you in connection with

23  the investigation?

24    A.   He was my advisor for the entire UCLA process, as well

25  as the transfer process.

33

1    Q.   So this is dated June 12, 2017?

2    A.   Correct.

3    Q.   Is that an accurate date?

4    A.   I have no way to confirm what date this was.

5    Q.   Do you have any reason to dispute it?

6    A.   No.

7    Q.   Okay.  So there are a lot of redactions in here.  Can we

8    assume that under those redactions, this letter refers to you?

9    A.   Yes.

10   Q.   Okay.  And looking at the first and second lines of this

11   document, do you see where there's a redaction that goes from

12   the end of the first line to the beginning of the second line?

13   A.   Yes.

14   Q.   Does that refer to UCLA there?

15   A.   Yes.

16   Q.   So this letter, if I'm reading it correctly, says that

17   there were two investigations at UCLA?

18   A.   Correct.

19   Q.   Okay.  How did the other one -- well, let me back up.

20   Let me -- let's go to Exhibit J.  Go behind tab J in that

21   binder.

22   A.    Yes.

23   Q.   Okay.  What is tab J overall?

24   A.   6-4?

25   Q.   Yes.  What is this document?

34

1    A.    I believe this was the third and final submission to the

2    admissions office.

3    Q.    So you submitted this to OSU?

4    A.    I believe my attorney submitted it under my, I guess,

5    allowance.

6    Q.    So it was submitted on your behalf.

7    A.    Correct.

8    Q.    So you'd stand by the accuracy of what it says.

9    A.    Yes.

10    Q.    Okay.  Let's go to pages 159 to 161 within that

11    document.

12    A.    Yes.

13    Q.    Okay.  So this is -- if I'm understanding it correctly,

14    it addresses one of the investigations; is that correct?

15    A.    Correct.

16    Q.    What happened to the other investigation?

17    A.    Like, what happened as in what?  Like, what do you

18    mean --

19    Q.    Is it still going on?  Was it resolved?

20    A.    It's also being petitioned in the courts of California.

21    Q.    So there was a separate decision in that one?

22    A.    I believe so.

23    Q.    And did you disclose that to Ohio State?

24    A.    No.  I don't believe I was ever asked.

25    Q.    Okay.  So when did that one start?

1    A.    At the exact same time as this one.

2    Q.    Okay.  Did it end at the same time?

3    A.    I believe so.

4    Q.    Okay.  So how did you first learn of these

5    investigations?

6    A.    Through the online communication that UCLA provided for

7    me, that portal that I've been mentioning.

8    Q.    Okay.  About when did you learn about it?

9    A.    I believe I got a no contact order at some point in

10   either February or March of 2017, and then later on I found out

11   that there was some allegations against me which was the

12   March 10 letter in question.

13   Q.    What's a no contact order?

14   A.    To not send a text, call or e-mail or anything of that

15   matter with the person filing -- or with some person that UCLA

16   disclosed.

17         MS. LAU:  Your Honor, I'm sorry, if I may.  I just

18   want to note for the record the investigations, if you could

19   just clarify with the witness whether that was related to the

20   same complainant or not.

21         THE COURT:  I'm sorry, whether it was --

22         MS. LAU:  Related to the same complainant.  It's

23   unclear based on the questions.

24         THE COURT:  You mean between the two of them?

25         MS. LAU:  Right.  Mr. Marti had raised that there were

36

1   two investigations, and I just wanted him to clarify with the

2   witness if that was related to the same complainant or

3   different complainants.

4           THE COURT:  Do you mind doing that?

5           MR. MARTI:  Yes.

6   BY MR. MARTI:

7   Q.   Can you tell us?

8   A.   I'm sorry, I don't think I understand the question.

9   Q.   Were there two different complainants?

10  A.   Yes.

11  Q.   And there were two separate investigations?

12  A.   Correct.

13  Q.   So was a no contact order issued in connection with both

14  of them?

15  A.   I do not remember.  I believe it was only one.

16  Q.   But you did get a no contact order basically in February

17  of '17?

18  A.   Either late February or early March.  I don't know the

19  exact date.

20  Q.   Let's go back to Exhibit J.  And, again, the page range

21  is 159 through 161.  I'm particularly interested in page 160.

22  A.   Okay.

23  Q.   Are you there?

24  A.   I'm on page 160.

25  Q.   Do you see where it says interim measures towards the

37

1   bottom of the page?

2      A.   Yes.

3      Q.   Can you read the sentence immediately after that?

4      A.   "The mutual no contact order issued by the Title IX

5   office on February 16, 2017 shall remain in effect."

6      Q.   Okay.  Do you have any reason to believe that that order

7   didn't go on around February 16?

8      A.   No.  Like I said, it was sometime in either February or

9   March.

10     Q.   Very good.

11          So what did you understand was being investigated?

12     A.   To my knowledge, what I thought at the time was being

13  investigated was an unrightful accusation, and I will continue

14  to say that until the day I die, and that is why I'm fighting

15  it in the California court system because I know what happened

16  is not what is alleged.

17     Q.   I'm not asking you to agree with the allegation.  I'm

18  asking you to describe it.

19          What was the conduct that was alleged?

20     A.   It was something -- it was a conduct that would break

21  the Title IX policy.

22     Q.   So sexual misconduct of some sort?

23     A.   Correct.

24     Q.   So this is serious business.

25     A.   I'm well aware.

38

1    Q.    Okay.  So, remember, we looked at the complaint that you

2    filed in California a little while ago, and one of the

3    allegations indicated that there were 10, 15 witnesses.

4         Does that sound right?

5    A.    I don't know the exact number, but yes there was

6    multiple witnesses.

7    Q.    So this is a serious matter.

8    A.    It was serious but also, I mean, there's a lot of

9    evidence that was on my side.  I provided these witnesses.

10   Q.    You know, I'm not disputing that.

11        So did you understand that there were serious

12   consequences if this went badly for you?

13   A.    I think that any sort of case can go badly, whether it

14   be jaywalking or sexual misconduct.  There's always bad

15   consequences if you're found guilty.

16   Q.    Okay.  So that's why you retained Mr. Dudley to help you

17   with the matter?

18   A.    I retained Mr. Dudley so I could focus on being a

19   student first and this -- I mean, this whole process at UCLA is

20   pretty dense and pretty legal, and it has a lot of definitions

21   that a 19-year-old kid doesn't really have the knowledge about.

22        Not only that, I'm getting crammed by schoolwork, so I

23   retained him to both help me focus on that and give me the

24   guidance through this tense process, I guess.

25   Q.    So he was basically your defense counsel in this

1    proceeding.

2      A.   He was my advisor.

3      Q.   Did he appear in the proceedings?

4      A.   Yes, as my advisor.

5      Q.   Okay.  So you were assisted by counsel in this process.

6      A.   He happened to be a lawyer, but at the time he was my

7    advisor.

8      Q.   Let's take a look at the notice that was produced for

9    the first time today.  Do you have that handy?

10     A.   I don't know what document you're talking about.

11     Q.   The March 10 letter.

12     A.   Yes.  Yes.

13         MR. MARTI:  I guess for purposes of identification,

14   Your Honor, I would like to offer this or mark it as

15   Defendant's N, as in Nancy.

16         THE COURT:  All right.  It will be noted as

17   Defendant's N.

18   BY MR. MARTI:

19     Q.   So, if I understood your testimony correctly earlier,

20   you received this on or around March 10?

21     A.   Correct.

22     Q.   Okay.  And you shared it with Mr. Dudley about that

23   time?

24     A.   I gave Mr. Dudley access to go through that UCLA portal

25   I've been mentioning so that he could see this.

40

1    Q.    And, as I understand it, this was part of the record in

2    the California mandamus proceeding?

3    A.    I don't know.  I believe so.  I don't know.

4    Q.    I'm just trying to clarify what you testified to before.

5    I understood you to say it was.

6          Did I misunderstand?

7    A.    I'm not sure I understand the question.

8          THE COURT:  If I can clear it up, you had mentioned an

9    administrative record that's part of that case.  Is it part of

10   that administrative record?

11         THE WITNESS:  I --

12         MS. LAU:  Your Honor, I think the witness is just

13   confusing the terminologies.  It was.

14         THE COURT:  I'm the trier of fact again.  I can do

15   things I wouldn't do in front of a jury.  I believe he

16   testified that the way he got access to it, because of the way

17   the portal worked, was that his lawyer had gotten access to

18   this during the mandamus action.  Don't you recall that as

19   being his testimony?  I don't think there's any of this in

20   dispute, by the way.  It's just a matter of laying a foundation

21   here.

22         MS. LAU:  Right.

23         If I understand you correctly, Your Honor, you're

24   clarifying he only got possession of this March 10 letter

25   during this administrative process for Ohio, right?

41

1          THE COURT:  No.  I thought it was in the writ of

2    mandamus action in California, that there was a record produced

3    for the court there and that he had seen this letter, is what I

4    believe he said, close in time to when it was issued but he

5    couldn't copy it out until the administrative record was

6    produced in the California case.

7          MS. LAU:  Yes, Your Honor, that's correct.

8          MR. MARTI:  You answered my question for me.  Thank

9    you.

10          THE COURT:  I didn't mean to testify in this case.

11          MR. MARTI:  No, you're moving things along.  I

12    appreciate it.

13    BY MR. MARTI:

14    Q.   Mr. Doe, could you look on the first page of what's now

15    been marked as Defendant's N, the last paragraph on that first

16    page?

17    A.   Yes.

18    Q.   Could you read that aloud for us?

19    A.   If this allegation is true, your behavior could be in

20    violation of the UC SV and SH policy, as well as Sections

21    102.08, conduct that threatens health or safety, and 102.09,

22    sexual harassment of the UCLA student conduct code, in quotes

23    UCLA code.

24    Q.   So it sounds to me like you are being charged with

25    violating these specific provisions.  Would you agree?

42

1    A.   Nope.

2    Q.   Well, what do you think it means then?

3    A.   It says if these allegations are true.  So there was

4  allegations.

5        THE COURT:  One moment.  There's an objection.  All

6  you're asking about is if true.  You're not asking him to

7  assume it's true.

8        MR. MARTI:  No, I'm not.

9        THE WITNESS:  So no, there was no charges.  It says if

10  these -- if this allegation is true.  So, in my mind, it was an

11  allegation.

12  BY MR. MARTI:

13    Q.   So it was an allegation.

14    A.   Correct.

15    Q.   And it's made officially by the University of

16  California.

17    A.   Correct.

18    Q.   Thank you.

19        So let's shift gears a little bit, and let's talk about

20  the transfer to OSU.

21    A.   Correct.

22    Q.   If I understood your testimony correctly, the

23  investigation at UCLA was at least part of the reason you were

24  seeking to transfer; is that correct?

25    A.   It was the hair that broke the camel's back, so to

43

1   speak.

2     Q.   So it was definitely a factor then.

3     A.   It was one of the factors.

4     Q.   So when did you start looking around at transferring?

5     A.   At the start of my sophomore year at UCLA, which would

6   be September of 2016, I believe.

7     Q.   Okay.

8     A.   Because they're on the quarter system.

9     Q.   How many schools did you look at?

10    A.   Off the top of my head I couldn't name all the schools.

11  I mean, I was looking -- excuse me?

12    Q.   Just a ballpark estimate.

13    A.   Five to ten.

14    Q.   Did you apply to any schools beyond Ohio State?

15    A.   Yes.

16    Q.   Ballpark, how many?

17    A.   Again, five to ten.

18    Q.   Okay.  And was it your experience that the applications

19  that you filed for transfer varied from school to school?

20    A.   Yes.  Every school had a different way of providing a

21  transfer application, transfer questions, et cetera.

22    Q.   Okay.  So when did you begin applying to transfer to

23  Ohio State?

24    A.   I don't know the exact date I was looking to transfer,

25  but I decided to transfer towards the end of my school year of

44

1   2017.

2   Q.   So that would have been spring of '17?

3   A.   Give or take, yes.

4   Q.   And, at that point, was the investigation at UCLA still

5   going on?

6   A.   I don't know if it had began or had not begun.

7   Q.   Now, we just established that your mandamus complaint

8   said that it started in February of '17 and went through --

9   A.   Yeah, but you asked if I was looking to transfer, had

10  the investigation begun.  I was looking to transfer before the

11  investigation began.

12  Q.   But my question was when you started applying to Ohio

13  State.

14  A.   Oh, then yes, yes, the investigation was underway.

15  Q.   And the no contact order was still in effect?

16  A.   I believe so.

17  Q.   And you're still represented by Mr. Dudley in connection

18  with the investigation; is that correct?

19  A.   At that time I was represented by Mr. Dudley.

20  Q.   Okay.  So describe the process for applying to

21  Ohio State.

22  A.   I'm not sure what you mean by describe the process.

23  Q.   Well, walk me through what you did to apply to

24  Ohio State.

25  A.   For all college admissions you have to submit, I guess,

45

1   your transcripts which I submitted to Ohio State.  I believe

2   maybe an SAT score which I provided.

3         I would like to note that there was nothing on my

4   transcripts that said I couldn't go back to UCLA.  It even

5   provided the classes I was enrolled in the following semester

6   so -- or quarter.  So, I mean, if charges were pending at that

7   time, I would have not been able to go back.

8         But you basically put in all these documents, you fill

9   out your information about yourself, what classes you've taken,

10  what classes I was enrolled in, and sign -- like, there's

11  certain questions that each application provides like Ohio

12  State did.

13    Q.    So you're describing applications generally not specific

14  to Ohio State.

15    A.    No.  That's what I did for Ohio State and all my other

16  applications.

17    Q.    Let's go to the exhibits behind tab C in that binder

18  there.

19    A.    Yes.  C-1 or C?

20    Q.    Well, we'll start with C, just C.

21    A.    Okay.

22    Q.    So this is a document that your lawyers filed with the

23  court heavily redacted, and then let's take a look at C-1.

24    A.    Okay.

25    Q.    Is it fair to say that C-1 is an unredacted copy of C?

46

1    A.    Yeah.

2    Q.    Okay.  So was this your application to Ohio State?

3    A.    Like I said, I don't have a copy of it.

4          Wait a second.  I don't know -- I just realized this,

5    but it has my birth date wrong.  I don't know how that's

6    possible.  So I have no way of saying this actually is my

7    application.

8    Q.    Well, let's look at some of the pretty specific

9    information here and see if that lines up.

10   A.    Well, the --

11   Q.    Let me ask the questions, and we'll get through it a

12   little quicker that way.  So let's go to on page 2.  You see

13   where in the middle of the page it references employment?

14   A.    Yep.

15   Q.    Could you take a moment and review that?

16   A.    Yep.

17   Q.    Is that generally accurate?

18   A.    Yeah, I'd say it's generally accurate.

19   Q.    So it describes who you worked for, what you did, how

20   many hours you worked, how long you worked there.

21   A.    Yes.

22   Q.    How would OSU know that if you didn't fill this form

23   out?

24   A.    Well, I'm sure I had to apply for -- when I did fill out

25   my application, that was in there.  But I'm pretty certain that

47

1    I wouldn't put my own birthday incorrectly on an application.

2        Q.    I'm not asking you about the birthday.  I'm asking you

3    about the employment.

4            It's accurate, we agree with that?

5        A.    Yeah.

6        Q.    My question is how would OSU know that if you hadn't

7    told them that?

8        A.    Like I said, I'm sure on my application I did fill in

9    some sort of employment.  Like I said earlier, you have to fill

10   in information about yourself, which I did.

11       Q.    Okay.  Let's go down the page a little bit, and you see

12   where it says admissions information and below that it says

13   course requirements?

14       A.    Yes.

15       Q.    And then there's some classes listed from UCLA.  Do you

16   see that?

17       A.    Correct.

18       Q.    Is that information accurate?

19       A.    Yep.

20       Q.    Okay.  Did you take those courses at UCLA on the main

21   campus there?

22       A.    Yes, I did.  As would have been proven by my transcripts

23   that I submitted to Ohio State.

24       Q.    So this is accurate.

25       A.    Yes.

48

1   Q.   How would OSU know that if you didn't put it in there?

2   A.   They could have easily referenced my transcripts that I

3   submitted to Ohio State which has all the classes I was taking

4   and the classes I was enrolled in for the next quarter.

5   Q.   Let's go to the next page, and you see it has -- it asks

6   about how many siblings you have, talks about your family.  It

7   talks about an injury that you suffered with great detail.

8        Do you see that?

9   A.   Yes.

10  Q.   Is that information accurate?

11  A.   Yes.

12  Q.   So how would Ohio State know that if you hadn't provided

13  it?

14  A.   I'm not saying that I didn't provide this to Ohio State.

15  Q.   So you testified earlier that you really couldn't recall

16  one way or another what the Ohio State application looked like;

17  is that correct?

18  A.   Correct.  I didn't know the exact specific details of

19  every question on a four-page transfer application.

20  Q.   Okay.  So let's go to -- back to tab J, behind tab J

21  again, and let's start with page 156.

22  A.   156?

23  Q.   Yes, sir.

24       And do you see about -- I'm sorry, are you there?

25  A.   Yes.

49

1    Q.    Okay.  So do you see in the middle of the page there's a

2    paragraph that starts talking about Ms. Wiechart?

3    A.    Yes.

4    Q.    And then there's an indented thing, and then it says --

5    then do you see the paragraph underneath that?

6    A.    Yes.

7    Q.    Could you read that paragraph for me?

8    A.    The when I met or I had asked?

9    Q.    I asked my attorney.

10   A.    "I had asked my attorney at the time how I should

11   respond and then answered correctly no to the first two

12   questions and yes to the third question."

13   Q.    And then attachment 3, do you see that, where it

14   references that?

15   A.    Yes.  Yes.  And attachment 3.  Sorry, I didn't --

16   Q.    No, that's all right.

17         Let's go back to page 165 of the same document.

18   A.    Yes.

19   Q.    That's the attachment 3 you were referencing?

20   A.    Correct.

21   Q.    So what is this thing, this document?

22   A.    This is a screenshot that I had that was of me asking my

23   attorney, Robert Dudley at the time, also this was for Ohio

24   State in quotes, and a picture of what I believed were the

25   questions I was asked.  It only makes, I mean, logical, you

50

1    know, chronological sense that if I was asking my attorney

2    about Ohio State, I would have presented the questions for

3    Ohio State.

4       Q.    And then I take it this is your attorney's response down

5    there where it says no, this is not a judicial matter?

6       A.    Correct.

7       Q.    So how can you be sure that this isn't an application

8    from one of the other schools you were looking at?

9       A.    Like I said, also this was for Ohio State.  I don't

10   think I would say this was for Ohio State being a different

11   school.

12      Q.    So can you categorically rule out the fact that this is

13   from a different institution?

14      A.    I don't know what categorically --

15      Q.    Could you absolutely rule out the fact this is not from

16   a different institution?

17      A.    I cannot absolutely rule out it's from a different

18   institution.  It's my belief that it's for Ohio State.

19      Q.    So let's talk a little bit about your interaction with

20   Mr. Dudley in connection with this transfer process.

21           So why were you asking him about what to disclose to

22   Ohio State?

23      A.    I retained him for an advisor role because, like I said,

24   this is not my field of study.  This isn't my world, like

25   judicial law stuff.  That's not what I'm studying, that's not

1  even what I'm, you know, knowledgeable on.  So I got him

2  involved to make sure that everything I was doing was accurate

3  and truthful when looking at other schools, such that when I

4  got to another school, there wouldn't be an issue like this.

5     Q.   So if I'm reading this, it seems to me like you and

6  Mr. Dudley are trying to figure out how to disclose as little

7  as possible.

8           MS. LAU:  Objection.

9           THE COURT:  Overruled.  It's cross-examination.

10       You may answer.

11          MR. MARTI:  Is that a fair summary?

12          THE WITNESS:  Could you repeat the question, please?

13   BY MR. MARTI:

14    Q.   So as I look at page 165, this looks like a conversation

15   about how to disclose as little as possible.

16    A.   No, this is just me confirming the fact that what I was

17   answering was truthful and accurate, which I did for every

18   application.  There was no hiding or going behind the backs.

19   It was saying is this accurate, and he said yes.

20    Q.   Did you have any conversations with Mr. Dudley about

21   what the effect would be of disclosing the investigation to

22   Ohio State or other schools?

23    A.   I never -- I -- could you repeat the question, please?

24    Q.   Sure.

25          Did you have any conversations with Mr. Dudley about

52

1    what the effect of disclosing the investigation would be on

2    your prospects with Ohio State or other schools?

3        A.    To my recollection, I don't exactly remember a

4    conversation like that.  I'm sure we did talk about how the

5    transfer process would go, but I don't believe there was ever a

6    time where I said what happens if I lie, because that wouldn't

7    be something that I --

8        Q.    That's not my question.

9              My question was did you discuss how much of the

10   investigation you had to disclose to the other schools?

11       A.    I'm sure I did.

12       Q.    Thank you.

13             So once the transfer started -- or, excuse me.  Let me

14   strike that.

15             Once Ohio State started investigating the accuracy of

16   your transfer documents, you were represented by counsel in

17   that process?

18       A.    Correct.

19       Q.    Mr. Hathaway?

20       A.    And later on Ms. Lau.

21       Q.    Okay.  Let's go to tab H.  Can you tell us what this

22   document is?

23       A.    Page I.D. 69?

24       Q.    Yes.

25       A.    This appears to be one of my responses to, I believe,

1  the second request from admissions about me releasing my FERPA

2  release which I did with zero restrictions or limitations.

3  Q.   Okay.  So could you read the first two sentences -- the

4  first two sentences of the third paragraph in that document?

5  A.   When I completed the application to Ohio State, I was

6  abroad studying.  I even took a screenshot and asked

7  Robert Dudley, my advisor/attorney at the time, and answered

8  the way he advised.

9  Q.   Okay.  So I'm confused.  You had just told us before

10  that you were on UCLA's main campus taking the courses that are

11  disclosed in your application.

12  A.   In June of -- June 22, I believe I was not in school.

13  Q.   But you completed the application.  So you were done by

14  then is what you were saying.

15  A.   Yes.

16        MR. MARTI:  May I have a moment to confer with

17  co-counsel?

18        THE COURT:  You may.

19        MR. MARTI:  I don't have any further questions,

20  Your Honor.

21        THE COURT:  Thank you.

22     Redirect, Ms. Lau?

23        MS. LAU:  Yes, Your Honor.

24

25

54

1                                    - - -

2                         REDIRECT EXAMINATION

3      BY MS. LAU:

4      Q.    Mr. Doe, to your knowledge, were you notified of the no

5      contact order before you received notice of the allegations

6      themselves?

7      A.    Correct.

8      Q.    And the no contact order was issued in or about

9      February 2017?

10     A.    Correct.

11     Q.    And the investigation commencement, as well as the

12     allegations, those were issued in that March 10 letter that we

13     looked at earlier?

14     A.    Correct.

15     Q.    At any time during the investigation that Ohio State had

16     commenced about your transfer application, did you happen to

17     notice any changes in Ohio State's application questions to

18     incoming students?

19     A.    Yes.  When looking back, I noticed that, instead of

20     disciplinary charge, it now states disciplinary action which is

21     an entirely different definition and meaning and they carried

22     different connotations, I believe, in my opinion as well, and I

23     guess in a legal court of law.

24     Q.    Do you believe disciplinary action is broader?

25     A.    Far more broader.  And I believe that it was changed

1    possibly due to this case as it is here today.

2        Q.    Could disciplinary action include investigation, in your

3    understanding?

4        A.    Yes.

5        Q.    So had you been asked if any disciplinary action was

6    pending against you at the time that you applied to Ohio State

7    in June 2017, what would you have responded with?

8        A.    I would have --

9            MR. MARTI:  Objection.

10            THE WITNESS:  -- responded accurately.

11            MR. MARTI:  Objection.

12            THE COURT:  Truthfully, I think we're into a purely

13    legal area here anyway, what these words mean.  And as much

14    as -- I'm not blowing off the testimony here, but this is my

15    job and it's your job to persuade me what the legal consequence

16    of the term is, not a witness's.  So let's move forward if we

17    could.

18            MS. LAU:  I was just trying to establish his intent at

19    the time.

20            THE COURT:  We'll spend some time on the words at the

21    end.  This is just the testimony portion.

22            MS. LAU:  Okay.

23        No further redirect.

24        Thank you, Your Honor.

25            THE COURT:  Before you finish, because you may want to

1    ask some more questions, put yourself in my spot for a moment.

2    I'm trying to get all the facts I can get here.

3         So we have two matters, one in February, one in March

4    where Mr. Doe has indicated he has received some type of

5    notification.  We're going to argue in a moment whether that

6    satisfies the question on the transfer form.  But there's a

7    process taking place between those two dates and then the final

8    decision in, what is it, October of the year, and this is

9    important because in late June is when the application's filed

10   with Ohio State.

11        I want to be clear what else might have been received in

12   the file that you have that I haven't seen between March 10 and

13   June 22 of 2017.

14        Now, you know, Mr. Marti hasn't asked for this, I'm not

15   going to compel it unless he asks for it; I might have a

16   different response, but you're leaving me sort of guessing, and

17   I'm not sure that's the place you want to leave the trier of

18   fact.

19        MS. LAU:  Not at all, Your Honor.  We understood that

20   we needed to provide when the investigation opened and so we

21   did that today.

22        THE COURT:  Somewhere along -- but I know just enough

23   about academic discipline to be dangerous, and I know there are

24   a lot of steps.  I just want to be clear if there are any other

25   steps in between those two dates that may have some bearing on

57

 1    this case.

 2              MS. LAU:  May I confer with my co-counsel?

 3              THE COURT:  Sure.

 4         And, just to be clear, the easiest answer is there's

 5    nothing there.  If that's the case, then I'm satisfied.  But

 6    I'm not sure.  That's why I'm posing this.

 7              MS. LAU:  Right, Your Honor.

 8         We would like to rest on John Doe's testimony about the

 9    steps in the process and when he was notified by the school

10    about what was happening next at UCLA.

11              THE COURT:  All right.

12              MS. LAU:  Thank you.

13              THE COURT:  Mr. Marti?

14              MR. MARTI:  Your Honor, I would like to see that file

15    and before I continue -- excuse me, before I conclude my

16    interrogation of Mr. Doe.

17              THE COURT:  So let me hear from each of you.  Let me

18    start with you, Mr. Marti.

19         You would agree with me that the -- that the conduct

20    itself isn't what is at the core of why Ohio State took the

21    action.  It was a lack of candor.

22         Would you agree with that?

23              MR. MARTI:  Correct.

24              THE COURT:  So I understand Ms. Lau's position that

25    putting the conduct into the record here -- and we can talk

1    about whether this should be sealed or not.  That's a different

2    issue.  But what I'm focused on right now is much narrower.

3    It's notice.  It's when he knew what.

4        I don't think that's going to completely resolve your

5    objection, Ms. Lau, but if we focused on only that and not a

6    graphic description of what the hearing involved.

7        MR. MARTI:  That's fine with us, Your Honor.  I don't

8    know what I don't know.

9        THE COURT:  Right.

10        MR. MARTI:  But what I want to see is what paperwork

11    went back and forth between UCLA and Mr. Doe, not to see the

12    details of the underlying incident, but to judge the

13    communication back and forth because that could be probative as

14    to what he knew before he applied to OSU.

15        THE COURT:  If we limit this to I believe the

16    application date was finalized -- the application was June 22

17    of 2017, Ms. Lau, what's your view if we look at this in

18    terms -- really, I'm thinking more of documents received by

19    Mr. John Doe between, it would be, March 10, 2017 and June 22,

20    2017 from UCLA, and redacting anything that has nothing to do

21    with notice.

22        MR. MARTI:  Your Honor, if I could interject, I would

23    also like to see any correspondence from Mr. Doe to UCLA

24    because that could be probative of what he knew as well.

25        THE COURT:  Fair enough.  That's notice too.

59

1         MS. LAU:  Can we take a 5-minute recess, Your Honor?

2         THE COURT:  That would be fine.  We'll be in recess

3    for 5 minutes.

4       (Recess taken at 2:48 p.m to 3:05 p.m.)

5         THE COURT:  Ms. Lau, where do we find ourselves?

6         MS. LAU:  Your Honor, we have the correspondence that

7    you're looking for.

8         THE COURT:  All right.  Do you want to give those to

9    the courtroom deputy?

10        MS. LAU:  Yes.

11        MR. MARTI:  Is that the entirety of the correspondence

12   between UCLA and your client up until the date of the

13   application?

14        MS. LAU:  Yes, it is.

15        THE COURT:  Ms. Lau, as far as you know, that's it?

16        MS. LAU:  That's as far as I know, yes.

17        THE COURT:  And do we have copies for Mr. Marti, or we

18   can make some?

19        MS. LAU:  We do not.

20        THE COURT:  Okay.  Mr. Marti, give me one second and

21   I'll share these with you.

22       Ms. Lau, from what you know of these two, is this the

23   same complainant or is it the two different cases that merged

24   together?

25        MS. LAU:  I believe they were tried together.

60

```
1            THE COURT:  But they're two different actions.  In

2   other words, two letters here, right?

3            MS. LAU:  Two different letters, correct.  It was just

4   the chronology of the correspondence.

5            THE COURT:  But it's not the -- by the way, the name

6   is not redacted.  We'll take that out.

7            MS. LAU:  We weren't prepared to -- I mean, we had it

8   ready for you, Your Honor.

9            THE COURT:  I'm sorry.  I'm missing your -- I'm being

10  a little dense here.  So the first one is May 8th, the second

11  is July 14.  These are two different cases?

12           MS. LAU:  No, it's the same case.

13           THE COURT:  What I'm going to do before we go any

14  further is take out the e-mail address and the dear, okay?

15           MS. LAU:  Thank you.

16           THE COURT:  Ms. Lau, we'll give Mr. Marti just a

17  moment.  Are you completed with your redirect?

18           MS. LAU:  Not in light of producing these documents.

19           THE COURT:  Very good.  So, Mr. John Doe, if you'd

20  come back to the stand, please.

21           MR. MARTI:  Your Honor, may I have a minute --

22           THE COURT:  I was going to say we're going to wait.

23  He's just going to take the witness stand, and you're going to

24  review those.

25           MR. MARTI:  Is this our only copy?
```

61

1          THE COURT:  We can make copies.

2          MR. MARTI:  I would kind of like to make some notes.

3          THE WITNESS:  May I also get a copy to look at?

4          THE COURT:  Yes.  I believe we have an extra copy too.

5    The witness will need one as well.

6          Ms. Lau, whenever you're ready, you may begin redirect

7    examination.

8          By the way, we should probably identify these.  The last

9    exhibit was Defendant's N.

10         Defendant's O will be the May 8, 2017 letter, and P will

11   be July 14, 2017.

12         MS. LAU:  Thank you, Your Honor.

13   BY MS. LAU:

14   Q.   Mr. Doe, do you have an independent recollection of

15   receiving the May 8, 2017 letter identified as Defendant's O?

16   A.   I do not remember exactly receiving this letter.  Like I

17   have said countless times, it's through the portal so I

18   don't -- I can't like reread these documents after they expired

19   and never really had access to them.

20   Q.   So do you recall ever receiving a letter from UCLA after

21   the investigation opened that described charges?

22   A.   I don't recall any letters describing charges, but I

23   note that I received these letters throughout the process.

24   Q.   And reading the May 8, 2017 letter today, does it change

25   your testimony earlier about what you understood about whether

62

1   you were being charged at the time you applied to Ohio State

2   University?

3       A.   Could you repeat the question?  I'm sorry.  I was

4   reading.

5       Q.   Now that you are reading the May 8, 2017 letter and you

6   are seeing in it that it says as stated in the March 10, 2017

7   notice of charge sent by the Title IX coordinator, does this

8   letter change your earlier testimony at all about what you

9   believed at the time that you filed the Ohio State application

10  in regards to any charges?

11      A.   No.  Again, that first document I got on March 10 was

12  not labeled notice of charges.  Again, I still believed charges

13  are done after an investigation.  And upon looking at Ohio

14  State's protocol, which is the school that I transferred to,

15  charges are brought after an investigation is done.  So basing

16  it off of the school that I'm currently at, there was no

17  charges pending.

18      Q.   I want you to take a look at the July 14, 2017 letter

19  identified as Defendant's P.  Do you have any independent

20  recollection of this letter?

21      A.   Again, I'm sure I got it, but I don't remember exactly

22  getting this one in particular, the language used in each and

23  every communication with UCLA, due to the limited amount of

24  time to reflect on the letters.

25      Q.   Can you read the first sentence of that letter?

63

1    A.    July 14?

2    Q.    The July 14 letter.  And we don't have to use the name

3    of the complainant.

4    A.    Okay.  "We notified you in a letter dated March 10, 2017

5    that UCLA's Title IX office was opening an investigation into

6    alleged conduct by you towards complainant."

7          Just the first sentence?

8    Q.    Yes.

9    A.    Okay.

10   Q.    Do you see the word charge anywhere in this letter of

11   July 14, 2017?  Take a moment if you need to look through it.

12   A.    When quickly reading through this, I didn't see anything

13   that stated charges that stood out to me, but I could have

14   missed something throughout reading it.

15   Q.    Does it say the word charge in reference to the March 10

16   letter?

17   A.    No.  It says the letter dated March 10.

18   Q.    Did you have a copy of either the May or the July letter

19   at the time that you filed your application or submitted your

20   application to OSU?

21   A.    No, I did not have any communication from UCLA at the

22   time I transferred to Ohio State.

23   Q.    Did you recall the contents of either letter at the time

24   that you applied to OSU?

25   A.    No, I did not recall the exact contents.  I have the

64

1   general gist of what each letter said, but remembering every

2   single word for each letter that I was only allowed a specific

3   amount of time for I did not remember.

4   Q.    Did you believe you were under charges at the time you

5   applied to OSU?

6   A.    No.  I believed I was under an investigation and, once

7   that investigation concluded, then I would be under charges if

8   found guilty.

9         MS. LAU:  Thank you.

10        No further questions.

11        THE COURT:  Thank you.

12        Recross?

13        MR. MARTI:  Yes, please.

14        Your Honor, before I do, do we have a copy of the

15  May 8th letter without the redactions just so I could get some

16  information from it?

17        THE COURT:  The only redactions I made would have been

18  the name and the e-mail address.

19        MR. MARTI:  Well, that's -- the e-mail address is what

20  I'm particularly interested in.

21        THE COURT:  Every copy I have I've obliterated so I

22  believe Ms. Lau would have that.

23        MS. LAU:  I don't have another copy, but you can hold

24  it to the light.

25        THE COURT:  I'm sorry?

1        MS. LAU:  I gave you the only copy that we had.

2        THE COURT:  Well, I apologize.

3        MR. MARTI:  It is what it is, Your Honor.  No problem.

4        THE COURT:  I mean, I can see the e-mail address

5   through -- if you would like to look at my copy.

6        MR. MARTI:  Will you stipulate that it's his e-mail

7   address?

8        MS. LAU:  At UCLA?

9        MR. MARTI:  Yes.

10        MS. LAU:  Yes.

11        THE COURT:  Okay.  Thank you.

12                              - - -

13                       RECROSS-EXAMINATION

14   BY MR. MARTI:

15   Q.   Mr. Doe, looking at Exhibit O --

16   A.   Which one is that?

17   Q.   That's the May 8th letter.

18   A.   Yes.

19   Q.   Could you read the first paragraph in that letter for

20   us?

21   A.   "As stated in the March 10, 2017 Notice of Charges sent

22   by the Title IX Coordinator and the Office of the Dean of

23   Students, Office the Student Conduct ("Dean"), the Office of

24   the Dean of Students has received information indicating that

25   you may have been involved in an incident which violates the UC

1    Policy on Sexual Violence and Sexual Harassment."

2    Q.    And is it fair to say that that paragraph refers to the

3    March 10 letter that we've marked as Exhibit N?

4    A.    Yes.  It states the March 10, 2017.

5    Q.    Thank you.  I appreciate it.

6          Sir, do we have -- is there an objection?

7             THE COURT:  Was that an objection?

8             MS. LAU:  I think we do have to object to that because

9    that's part of the issue, is whether we agree that that letter

10   on March 10 was a notice of charge or not.

11            THE COURT:  Well, it says what it says.  We'll debate

12   what the legal significance is, but the question was

13   appropriate.

14   BY MR. MARTI:

15   Q.    So this may be a bit far afield, but do you recall we

16   looked at the text message you sent to your lawyer when you

17   were filling out the application, the screenshot?

18   A.    Did I look at it?

19   Q.    Do you recall talking about the screenshot that we --

20   A.    When I applied?

21   Q.    Yes.

22   A.    I don't.  I know I communicated regularly with my

23   advisor prior to answering all the transfer documents for all

24   the schools I went to, but the only time that I can say for

25   certain that I looked at that screenshot was once admissions

67

1    brought this whole thing about.

2    Q.    Let me ask a better question to you.

3          Do you still have access to your -- the texts back and

4    forth between you and Mr. Dudley at that time?

5    A.    Unfortunately, I do not when, like, over the years, this

6    was like, what, two years ago, I don't have the exact text

7    messages handy.

8          MR. MARTI:  I don't have any further questions,

9    Your Honor.

10         THE COURT:  Thank you.  Mr. Doe, you may step down.

11         Any additional witnesses from the plaintiff?

12         MS. LAU:  No, Your Honor.

13         THE COURT:  You can give those to the courtroom

14   deputy, please.

15         MS. LAU:  No additional witnesses for the plaintiff.

16         THE COURT:  Mr. Marti, from the defendant?

17         MR. MARTI:  We have witnesses, Your Honor, but I would

18   like to see if we can make the equivalent of a Rule 50 motion

19   before we take up the Court's time with additional witnesses.

20         THE COURT:  All right.  We can.  I mean, truthfully, I

21   would like to get the whole record out.  I mean, how many

22   witnesses do you have?

23         MR. MARTI:  Just one.  We can put him on, Your Honor.

24         THE COURT:  Okay.  So you may call your witness.

25         MS. YANIKO:  We would like to call Jack Miner, please.

68

1      (Witness sworn.)

2          THE COURT:  Ms. Yaniko, you may proceed when you're

3   ready.

4          MS. YANIKO:  Where is the exhibit binder for the

5   witness?  I just wanted to make sure he could reach it.

6          Thank you very much.

7                          - - -

8                        JACK MINER

9   Called as a witness on behalf of the Defendant,

10  being first duly sworn, testified as follows:

11                    DIRECT EXAMINATION

12  BY MS. YANIKO:

13  Q.   Good afternoon.  Could you please state and spell your

14  name?

15  A.   Jack Miner, J-A-C-K M-I-N-E-R.

16  Q.   And where are you employed?

17  A.   The Ohio State University.

18  Q.   What is your title there?

19  A.   University registrar and executive director of

20  enrollment services.

21  Q.   How long have you held that position?

22  A.   Since July of -- or since October of 2016.

23  Q.   Where were you employed prior to October of 2016?

24  A.   Also with Ohio State also in the university registrar's

25  office.

1    Q.   In what capacity?

2    A.   I was senior associate registrar for about 10 years

3    prior to that, and 10 years prior to that I was director of

4    business operations.

5    Q.   In your capacity as university registrar, what are your

6    duties and responsibilities?

7    A.   My main responsibility is to be the keeper of all of

8    Ohio State University's academic structure and academic

9    programs, as well as manage the registration process, and I am

10   the custodian of the student record.

11   Q.   For any students?

12   A.   For all students, correct.

13   Q.   In your capacity as university registrar, are you

14   familiar with the university's application and admission

15   process for transfer students?

16   A.   Yes.  So in two ways.  One, my office works in

17   partnership with undergraduate admissions and graduate

18   admissions.  But, in addition to that, one piece of my

19   portfolio is the transfer credit evaluation process so I work

20   extremely closely with the transfer credit population.

21   Q.   To your knowledge and familiarity with the process, does

22   the content of the transfer application mirror the content of

23   the regular undergraduate admissions application?

24   A.   It is similar.  So for our undergraduate freshman

25   population, we use a service called the Common App that is used

1  fairly prevalently throughout higher education, and that is

2  essentially a service that provides all of us the same

3  information. For transfer students, we have an application

4  that we maintain ourselves and it is part of our student

5  information system.

6  Q. So then would it be fair to say that you have more

7  familiarity with one of the two types of applications?

8  A. Correct. I'm most familiar with the transfer

9  application because it's one that, one, the volume of those

10  that I see more regularly, but also because it's more internal

11  to Ohio State.

12  Q. Based on your knowledge of the transfer application

13  process, what information or assistance, if any, does the

14  university provide to prospective students who are completing

15  applications for admission?

16  A. So ultimately our interest is twofold. So our interest

17  is not just getting the best students, but also frankly getting

18  as many students as possible so it's really about getting the

19  largest possible pool that we can so we're able to be selective

20  of the students we bring. So we provide online information, so

21  there's FAQs, as well as documentation as part of the

22  application that helps students. But one of the other things

23  that we do is a student can call our customer service area, so

24  not just our admissions customer service area but our -- we

25  call it Buckeye Link at Ohio State, but it's our student

1  service center that will handle e-mail intake, phone intake, or

2  a student could even walk into either that location or walk

3  into our visitor center and at any of those locations ask

4  questions about the process or the application.

5  Q.   And those resources are available to any prospective

6  applicant?

7  A.   Correct, any prospective applicant.

8  Q.   How does a student complete and submit an application

9  for admission to the university?

10  A.   So the application is completely online.  It allows the

11  student to work on it over time so the student can begin the

12  application at one point and then submit it at a later date.

13  Q.   In your capacity as the university registrar, do you

14  have access to whatever online system the applications exist

15  within?

16  A.   So I have access to see the information once it is

17  submitted to Ohio State.  So once the student hits submit, it

18  is a file that I can see.

19  Q.   So can you tell me about that process?  After a student

20  hits submit, then what happens?

21  A.   So essentially the information is being held in a

22  database and, as soon as the student hits submit, it transmits

23  all of their answers to the student information system.  And

24  then we also at that same point create a pdf document of the

25  student's responses.  So we have both a document that looks

72

1    like a paper document or looks like what an application

2    reviewer would be familiar with, as well as the metadata that

3    has come into our student information system.

4        Q.   So then how does the electronic application become part

5    of the student record that is maintained by your office?

6        A.   So as soon as a student applies, it is immediately a

7    student record.  So that is something that is held within our

8    student information system, and I am already the custodian of

9    that the minute they hit submit.

10       Q.   Now, you have been individually named as a defendant in

11   this lawsuit that is being brought by Mr. Doe.  Are you

12   familiar with Mr. Doe?

13       A.   Not until today.

14       Q.   Had you heard of Mr. Doe before today?

15       A.   Only through this process.  So I was notified in early

16   October by our student conduct office that they had received an

17   allegation of sexual misconduct and, as part of their fact

18   finding for that process, they discovered that the student may

19   have provided incomplete or false information on their

20   admissions application and asked me to begin an investigation

21   into that.

22       Q.   So then through that process, did you have the occasion

23   to view any records in Mr. Doe's student file maintained by

24   your office?

25       A.   Yes.  So one of the first things that I did was reviewed

1   his application, and that was really an opportunity to look at

2   how had he answered the questions related to whether or not

3   there had been an investigation for either academic misconduct

4   or any other type of disciplinary misconduct or any charges

5   prior to coming to Ohio State.

6       Q.   If you could please open the binder to what has been

7   marked as Exhibit C and also C-1.  Please let me know when you

8   have the document.

9       A.   Yes.

10      Q.   Okay.  So if you look at C, C has a lot of redactions on

11  it.  And if you look at C-1, there are no redactions.

12      A.   Correct.

13      Q.   Do you recognize these two documents?

14      A.   I do.  That is our undergraduate transfer application

15  for Mr. Doe.

16      Q.   And how do you know that Mr. Doe -- that this is his

17  application?

18      A.   So both the redacted information one -- as you can well

19  imagine, I have reviewed this pretty extensively since this

20  started, but also both the redacted information, as well as

21  that unredacted information, there's enough there that I can

22  see that it's the same document.

23      Q.   Do you have any reason to believe that either the

24  redacted version barring the redactions or the unredacted are

25  anything other than a true and accurate copy of the

74

1  application?

2  A.   No.  There is no way that this could be anything other

3  than the application.

4  Q.   So, based on your testimony, I understand that Mr. Doe

5  would have submitted this application online; is that correct?

6  A.   Correct.

7       THE COURT:  I'm sorry, on?

8       MS. YANIKO:  Online.  I'm sorry.

9  BY MS. YANIKO:

10  Q.   According to Exhibit C, on what date did Mr. Doe begin

11  completing the application?

12  A.   He began completing the application on May 17, 2017.

13  Q.   And when was the application submitted?

14  A.   June 22, 2017.

15  Q.   If you could please look at the first page of the

16  application, can you tell me what the student I.D. is that is

17  included on the application?

18  A.   The student I.D. is created as soon as the student hits

19  submit, and that is a unique identifier within our student

20  information system to show that this information has now become

21  part of our student information system.

22  Q.   Who creates that number?

23  A.   That is a system generated number.

24  Q.   OSU's system?

25  A.   OSU system generated number.

1   Q.   If you're still looking at page 1 of Exhibit C, the

2   first page of the application, there is something called an

3   application number.  What is that?

4   A.   That is essentially a document status number.  So before

5   the student has hit submit when they're really just in the

6   pending status where they are still in the process of

7   completing the application themself, that is the reference

8   number that we could use to look up that information or the

9   student could reference to that information.

10   Q.   How is that number generated?

11   A.   That is also an auto generated number.

12   Q.   Through OSU's system?

13   A.   Through OSU's system.

14   Q.   So aside from adding or populating the student I.D. and

15   the application number, what changes would OSU have made to

16   this application after it was submitted?

17   A.   The only thing that we have control of within this

18   application other than those two numbers would be the date

19   started and the date posted to SIS.  And, again, those would

20   both be system generated dates based on actions of the student.

21   Q.   So do I understand from your testimony that OSU made no

22   other changes to this document?

23   A.   Correct.  And we have no way of doing that because,

24   again, this is system generated immediately as the student

25   submits, and this is the exact same appearance of the document

76

1   if the student would have saved a version for themself.

2   Q.   If you could now please turn to the fourth page of the

3   application, and the page I.D. at the top is 180 if you see

4   that number.

5       Do you have the document?

6   A.   Yes.

7   Q.   There's a heading that reads Certification of Truth

8   Statement.  Do you see that heading?

9   A.   Yes.

10  Q.   What is the purpose of the certification?

11  A.   So that is really you're signing essentially to say that

12  this is a document that you stand behind.  That you have

13  provided complete information, accurate information and been

14  truthful in the information that you submitted to us because,

15  again, this is the information that we will be using to make a

16  determination of your admission into Ohio State.

17  Q.   So does it serve any other purpose besides vouching for

18  what's in the document?

19  A.   The piece that I think is really important and it

20  follows that up is it also talks about what are the

21  consequences if you do not provide complete, accurate and

22  truthful information, and it talks about specifically that we

23  would revoke your admission and your registration if there is a

24  finding that you did not provide that information.

25  Q.   Still looking at that fourth page of the application

1    page I.D. 180, there's a heading that reads Personal History.

2         Do you see that heading?

3    A.    Yes.

4    Q.    What information does OSU seek in this section?

5    A.    So in this section again in both the scenario of

6    academic reasons or academic misconduct reasons, or in the case

7    of any disciplinary issue, we're looking for whether or not a

8    student has been suspended or dismissed or if there's an

9    investigation of a student based on something that's happened

10   at a prior institution.

11   Q.    Why?  What is the purpose of seeking this information?

12   A.    It really goes back to the idea of trying to create the

13   most complete application that we're able to get for a student.

14   So answers to either of those questions would not necessarily

15   exclude you from admission but, again, it would provide us an

16   opportunity to seek more information or for the student to

17   provide more information so we can make that part of either our

18   admission process or as a process to talk about this applicant

19   after an admission decision has been made.

20   Q.    And how did Mr. Doe respond to these personal history

21   questions?

22   A.    In both cases he answered no.

23   Q.    So for the redacted version, Exhibit C of the transfer

24   application that we've been discussing, aside from the

25   redactions, does the content of the printout of Mr. Doe's

1    undergraduate transfer application mirror the content of the

2    electronic application?

3      A.    Yes.

4      Q.    And how is it that you know that?

5      A.    Two reasons.

6            One is this is, again, created from a system that we

7    would not have the opportunity to change that, that this is

8    exactly as the student has seen it.

9            The other piece is that we do not change the questions

10   during a cycle.  One of the things that is really important

11   about the integrity of our process is, unlike some institutions

12   that would do an applicant review and admit you based on a

13   minimum GPA or a minimum ACT or SAT score, we do a holistic

14   review so we actually have multiple readers read every

15   application to make a decision.  Because of that, we need to

16   ensure that we're processing the same applications and

17   reviewing the same information for every student.

18           So once we've released an application to the general

19   public and allowed students to start applying towards it, we

20   wouldn't make any edits to that application until that cycle is

21   closed.

22           So for a normal freshman application, for example, we

23   only update anything on the application as a question every

24   August, and that follows through for a year.

25     Q.    So if Suzie, Jane and John all applied for admission for

79

1    fall semester of 2016 and they lived in different states, they

2    would have all been, if I understand your testimony correctly,

3    submitting the same application?

4    A.    Same application.  Other than the information they

5    provided and the system generated numbers, their applications

6    would all be identical to this.

7    Q.    You testified that the certification in Exhibit C refers

8    to the university's ability to revoke a student's admission or

9    enrollment.

10   A.    Correct.

11   Q.    In your capacity as the university registrar, are you

12   familiar with that process?

13   A.    I am.  And since I've been university registrar, I've

14   actually put a lot more structure around that process.  In my

15   time since becoming registrar, I've worked on probably a half

16   dozen of these, and prior to me being in the registrar role,

17   I'd probably worked another five to seven.

18   Q.    So why or when would the university consider revoking a

19   student's admission and registration?

20   A.    Most often it comes to us as some process at the

21   university or some entity this time at the university has

22   uncovered information that causes us to suspect that there's

23   been incorrect information provided to us.

24         At that point we'll start investigating, and it really

25   ends up being a process where we reach out to the student with

80

1  information that we've received this allegation and provide

2  them an opportunity to give us information that contradicts

3  that or give us information that supports their background.

4  Q.   How often does that process result in the student's

5  admission and registration being be revoked or canceled?

6  A.   It's not one hundred percent.  So in my time as

7  registrar, of the five or six that we've done there's been one

8  or two that we did not revoke the student's admission or cancel

9  their registration as part of the process.

10  Q.   When was the most recent revocation that you were

11  involved with?

12  A.   There was one within -- there was one Autumn 2018.

13  Q.   And is that this particular case?

14  A.   Separate from this one.

15  Q.   Separate from this case.

16      Were you involved in the revocation as it pertains to

17  Mr. Doe?

18  A.   Yes.

19  Q.   And you understand that we're here today because of the

20  university's decision to revoke Mr. Doe's registration?

21  A.   Yes.

22  Q.   When did the university begin considering whether to

23  initiate proceedings to revoke Mr. Doe's registration?

24  A.   I first found out about the allegations in early October

25  and then reached out to Mr. Doe in mid to late October.

1    Q.    And I believe you testified earlier -- and if I'm wrong,

2    tell me I'm wrong -- that the reason you found out was in the

3    course of some other proceeding being --

4    A.    Correct.  Correct.

5          Our student conduct office reached out to me in early

6    October saying that they had received an allegation of sexual

7    misconduct, and as part of their investigation of those charges

8    at Ohio State, they discovered that the student had been

9    suspended or dismissed from another institution and brought

10   that to my attention, and after that I began investigating it.

11   Q.    So what did you do to initiate --

12   A.    So the first thing that I did was, again, review the

13   student's application to see if they had disclosed that before

14   or disclosed anything before, and then in mid to late October

15   sent an e-mail communication to Mr. Doe outlining what

16   information we had received and specifically asking for

17   information, including a FERPA release, to be able to have a

18   conversation or for Ohio State to have a conversation with

19   UCLA.

20   Q.    And when you say FERPA, what do you mean?

21   A.    FERPA is the Family Educational Rights Privacy Act, and

22   it is a federal regulation that governs what information can

23   and should be shared about students both at the K through 12

24   and higher education level.

25   Q.    If you could please look behind tab D in the binder of

82

1    documents.  Let me know when you have the page.

2        A.    Yes.

3        Q.    Do you recognize this document?

4        A.    I do.

5        Q.    What is it?

6        A.    It is my e-mail and the attachments that I sent to

7    Mr. Doe asking for information.

8        Q.    And what is the date of the e-mail in the letter?

9        A.    October 18, 2018.

10       Q.    What is the purpose of this communication?

11       A.    The purpose of the communication was to outline that we

12   had received this allegation, that we were investigating, and

13   that the implication was if we had findings that there was

14   incorrect and incomplete or false information provided on the

15   application, that it could result in the revocation of

16   admission and cancellation of registration, and it asked for

17   specific documents as well as information be provided us as

18   part of that investigation.

19       Q.    What are the documents that you attached to the letter?

20       A.    I attached a copy of the student's application, as well

21   as a confidentiality waiver, or FERPA waiver, and that FERPA

22   waiver is from UCLA.  It's their version of the FERPA waiver.

23       Q.    It appears there's one additional attachment after the

24   application and before the waiver.

25       A.    Oh, I'm sorry.  The other piece that we submitted was

83

1    our faculty rule which is also an Ohio administrative rule that

2    outlines what improper registration or improper admission to

3    registration means and what the implications would be if a

4    student is found to have been admitted inappropriately.

5        Q.    Looking at the confidentiality waiver, who is

6    Krystal Reeb, the person whose name appears in that waiver?

7        A.    She is with Ohio State's office of student conduct.

8        Q.    And why is it that you were directing any documents from

9    Mr. Doe's prior institution be sent to Ms. Reeb?

10       A.    Ms. Reeb and her office regularly works back and forth

11   with other institutions when we have cases like this where we

12   are trying to get information about student conduct that's

13   happened at another institution.  So essentially it's

14   connecting another institution student conduct office with our

15   student conduct office.

16       Q.    Did Mr. Doe respond to your October 18 letter?

17       A.    He did.

18       Q.    What response did you receive from Mr. Doe?

19       A.    He responded with a number -- I think the first response

20   was asking for an extension of the timeline, and he did not

21   include the FERPA release at that time.  I believe he also may

22   have provided some other documents at that time though.

23       Q.    If you could please turn to tab E and the documents

24   behind tab E.  Do you have the page?

25       A.    Yes.

84

1    Q.   Do you recognize this document?

2    A.   I do.

3    Q.   What is it?

4    A.   It is a response from Mr. Doe to my first outreach to

5    him.

6    Q.   And what is the purpose of this communication?

7    A.   Primarily it is to ask for additional time in order to

8    review the records before sending them to us.

9    Q.   How much additional time did Mr. Doe request?

10    A.   He requested essentially another week, I believe it was.

11    Q.   And with this response, Mr. Doe also provided some

12    attachments; is that correct?

13    A.   Correct.

14    Q.   And do you recognize those attachments as being included

15    in Exhibit E?

16    A.   I do.

17    Q.   If you could please turn to page 153, the page number is

18    at the upper right-hand corner of the page --

19    A.   Yes.

20    Q.   -- of Exhibit E.

21    Do you have the page?

22    A.   I do.

23    Q.   This appears to be a screenshot of a text message

24    conversation.  Does that appear to be what that is to you?

25    A.   Yes.

85

1  Q.  And looking at the message, there is a statement that

2  says, quote, also this was for Ohio State, then there's a colon

3  end quote, and underneath that the statement there is what

4  appears to be a photo of some questions.

5      Do you see that?

6  A.  I do.

7  Q.  Do you recognize the questions reflected in this

8  screenshot?

9  A.  I don't.

10  Q.  Would you recognize them as having been Ohio State

11  University questions?

12  A.  They are absolutely not Ohio State University questions

13  and, to the best of my knowledge in my 20-plus years with the

14  registrar's office, this has never been our version of the

15  questions.

16  Q.  Did you respond to Mr. Doe's request for additional time

17  to submit a full response?

18  A.  I did.  I submitted a response to him granting him the

19  time to provide additional response but giving him, I believe

20  it was two days, to submit the FERPA release back to me.

21  Q.  If you could please turn to tab F, as in Frank, and the

22  document behind tab F.  Do you have the document?

23  A.  Yes.

24  Q.  What is it?

25  A.  That is my response back to Mr. Doe.

1    Q.    And what is the date of your response?

2    A.    November 7.

3    Q.    What is the purpose of your e-mail?

4    A.    That was to again inform him that I am still requesting

5    the same information that I'd been requesting throughout, which

6    was a copy of the executed FERPA release.  And it also was to

7    remind him that failure to comply with the directive may lead

8    to disciplinary action within Ohio State.

9    Q.    What additional information, if any, did you receive

10   from Mr. Doe following your e-mail to him?

11   A.    I received additional information, and the university

12   also received the FERPA waiver.

13   Q.    If you could turn now behind tab G, do you have the

14   document?

15   A.    Yes.

16   Q.    Do you recognize this document?

17   A.    I do.

18   Q.    What is it?

19   A.    That is the returned confidentiality waiver, or FERPA

20   waiver, from the student allowing -- based on the document,

21   allowing UCLA to provide Ohio State University.

22   Q.    Do you recall the date on which the university received

23   this waiver?

24   A.    I believe it was on November 9.

25   Q.    If you could turn now to what has been marked as Exhibit

1    H and the documents after that tab.  Do you have the document?

2    A.    Yes.

3    Q.    Do you recognize the document?

4    A.    Yes.

5    Q.    What is it?

6    A.    That is the response from Mr. Doe to me, and it was

7    dated November 13.

8    Q.    What additional information does Mr. Doe provide in this

9    response that he had not previously provided, if any?

10   A.    So in this document he provided, again, a reference that

11   he did receive some of the documents that he was asking for

12   from UCLA and he's continuing to request more complete records.

13   He once again reiterated that he had worked with his attorney

14   Mr. Dudley and asked for assistance but believed that he was

15   being truthful.

16   Q.    What did you do after you received Mr. Doe's November 13

17   supplemental response?

18   A.    The institution reached out to UCLA to be able to have

19   the conversations based on the FERPA release and,

20   unfortunately, we still weren't able to receive any information

21   because we were informed by UCLA that the student had contacted

22   them and was restricting what he was allowing them to share

23   with us.

24   Q.    Did you have any further correspondence with Mr. Doe?

25   A.    I sent another follow up e-mail to him, I believe, I

88

1   don't know the dates of that, asking for more information.

2   Q.   If you could please turn to Exhibit I in the binder,

3   please.  Do you have the document?

4   A.   Yes.

5   Q.   Do you recognize this document?

6   A.   Yes.

7   Q.   What is it?

8   A.   That is my correspondence of January 31, and that was

9   again asking for the information related to the charge date.

10   Q.   Why did you send this e-mail?

11   A.   So once we had received the information from UCLA and

12   they weren't able to provide us information, we -- I started

13   looking at UCLA's website, specifically their procedures around

14   sexual misconduct, to be able to see what would the process

15   look like assuming that their process was very similar to ours

16   and very similar to other schools across the country that when

17   a student is being investigated, they are given notice of that

18   investigation and that that would normally be something that a

19   student would realize and that the student should have

20   realistically known that when they were applying.

21        So in reviewing the information from UCLA, one of the

22   things they specifically outlined is that they produce a notice

23   of charges when they inform a student that there's an

24   investigation ongoing.

25   Q.   And did you ask that Mr. Doe provide this information by

1  any particular time?

2    A.   Yes.  I had requested that the -- again, this was dated

3  January 31, and I had again requested that the student provide

4  the charge date, meaning the date that the charges were issued,

5  and I wanted that by February 7.

6    Q.   Why were you asking Mr. Doe to confirm the charge date?

7    A.   Because, ultimately, that was at the crux of what we

8  were looking for and what we had consistently been asking for

9  over and over, was we wanted to see, again, had the student

10 answered the questions on the admission application truthfully

11 and completely.  And if on June 22 he knew that he was being

12 investigated and being charged, then he had inappropriately

13 answered that and not provided complete or accurate information

14 on the admission application.  So that was -- having that piece

15 of information was really at the crux of what we are trying to

16 find out.

17   Q.   What response, if any, did you receive from Mr. Doe by

18 the February 7 deadline you imposed?

19   A.   By the February 7 deadline, I received further

20 documentation -- an e-mail response and further documentation

21 from Mr. Doe.

22   Q.   If you could please turn to Exhibit J in the binder,

23 please.

24   A.   Yes.

25   Q.   Do you have the document?

90

1    A.    Yes.

2    Q.    Do you recognize this document?

3    A.    Yes.

4    Q.    What is it?

5    A.    It is Mr. Doe's response from -- I don't have the date,

6    but it is Mr. Doe's response.

7    Q.    And what additional information does Mr. Doe provide in

8    this response that he did not provide in his previous

9    responses?

10   A.    The documentation that he provided was a notice of

11   findings from UCLA's student conduct system, and that was dated

12   October 23, 2017.

13   Q.    Did Mr. Doe's response that we're looking at here in

14   Exhibit J satisfy your January 31 request for information?

15   A.    It did not.  It was still not giving us the specific

16   information that we were asking for.  We -- I was repeatedly

17   asking for the charge date or the date that the student was

18   aware that they were being investigated, and that was not at

19   all what was provided.

20   Q.    So if you could turn now, please, within Exhibit J to

21   page I.D. 159 through 161, do you have the page?

22   A.    Yes.

23   Q.    So, as I understand your testimony, this is a document

24   dated October 23, 2017 from UCLA.  Do you see the attachment?

25   A.    Correct.

1    Q.   According to this letter, what was the outcome of the

2    investigation?

3    A.   So this was a notice that the investigation had been

4    completed and that the student was found responsible for sexual

5    assault, in violation of UCLA's code of student conduct.

6    Q.   If you could flip back to page I.D. 156 in this

7    Exhibit J, please.

8    A.   Yes.

9    Q.   Mr. Doe in his response refers to this October 23, 2017

10   letter.  Do you see that?

11   A.   Yes.

12   Q.   And it makes reference to that October 23, 2017 letter

13   as being his charge date.  Do you see that?

14   A.   Yes.

15   Q.   So why is it then that you say that Mr. Doe didn't

16   provide his charge date if he's providing you a letter and

17   saying that that's his charge date?

18   A.   I think anyone reading this would realize that an

19   investigation would have been concluded sometime after the

20   charges had occurred and so, by definition in my mind, the

21   October 23 letter is, again, a notification that the

22   investigation has been complete so it implies that at some

23   point prior to that, there was a notice of charges.

24   Q.   What did the university do after you received Exhibit J

25   from Mr. Doe?

1  A.  After receiving Exhibit J, myself, our director of

2  undergraduate admissions and our counsel conferred, and

3  ultimately our director of admissions and I decided to move

4  forward with a revocation of admissions and cancellation of

5  registration.

6  Q.  You testified earlier that both in your capacity as

7  university registrar and previously during your tenure with the

8  registrar's office that you've been involved in various cases

9  of the university looking to revoke or cancel the registration

10  or admission of a student.  How did Mr. Doe's case compare to

11  those cases?

12  A.  In all of the cases that I have dealt with, this has

13  been the kind of most difficult and the most evasive, and it

14  really is a case that in all of the other cases that we have

15  seen, we have one of two types of response.  One is that the

16  student provides the information and provides an explanation of

17  why they omitted something, why they answered incorrectly or

18  inappropriately, and we use that information to make a

19  judgment.  And, again, sometimes that judgment is that we

20  revoke admission and registration, sometimes that decision is

21  that we allow the student to move forward.  That's one

22  possibility.

23      The other possibility is that the student doesn't

24  respond at all and just let's the process flow through, and we

25  usually move forward; or in the past we've always moved forward

1    with revocation and dismissal and cancellation of registration.

2         This one was -- is the only one that we've had where the

3    student was this evasive and that there was that much back and

4    forth.  And I think through my testimony, one of the things I

5    made reference to is that multiple times we were asking for the

6    exact same piece of information of what was that charge date,

7    when were you notified that you were being investigated, and at

8    no point through the entire process, even to this final

9    correspondence that was given to us on January 31, I believe,

10   at no point did the student ever share that information that we

11   were requesting.

12   Q.   So did you have further correspondence with Mr. Doe

13   following receipt of his February 6 response?

14   A.   The next information that went out to Mr. Doe was a

15   notice of cancellation of his registration and revocation of

16   his admission status.

17   Q.   If you could please turn now to Exhibit K.  Do you have

18   the document?

19   A.   Yes.

20   Q.   Do you recognize the document?

21   A.   I do.  It is my notice to the student that we were

22   revoking their admission and canceling their registration and

23   explaining both the background as well as the detailed back and

24   forth and process with the student.

25   Q.   So according to Exhibit K, why is it that the university

94

1   decided to cancel Mr. Doe's admission and registration?

2   A.   We are canceling your admission and registration

3   effective immediately based on improprieties in your

4   application for admission submitted on June 22, 2017.

5   Q.   There are page numbers in the lower right-hand corner.

6   Do you see the page numbers?

7   A.   Yes.

8   Q.   If you could please turn to page 3 of Exhibit K, there

9   is a statement that the February 6, 2019 response that Mr. Doe

10  provided directly contradicts information contained in the UCLA

11  student conduct procedures.  Do you see that reference?

12  A.   Yes.

13  Q.   So how is it that you determined that Mr. Doe's

14  February 6 response was contrary to UCLA's student conduct

15  procedures?

16  A.   So in reviewing their procedures, they specifically

17  outline in their procedures that are available online that they

18  issue a notice of charge, and that was at no point a document

19  that we received.  And, again, specifically the document that

20  we received from Mr. Doe on February 6 from UCLA that had the

21  October 23 date obviously was a document that was later in that

22  process, and it was making reference to findings rather than

23  the charges which would have logically occurred prior to that

24  process.

25  Q.   How did you obtain a copy of UCLA's procedures?

1      A.    I viewed those online.  I did a web search on their

2    website.

3      Q.    In looking at the third page of Exhibit K, there is a

4    footnote that appears to contain a web link --

5      A.    Yes.

6      Q.    -- redacted.

7      A.    Assuming the redacted area is where I went to.

8      Q.    So if you could please turn to Exhibit A in the binder

9    all the way at the front, do you have the document?

10     A.    Yes.

11     Q.    Do you recognize it?

12     A.    Yes.  That is the -- it appears to be the document that

13   I viewed online from UCLA.

14     Q.    Where in this document does UCLA identify the phrase

15   "notice of charges"?

16     A.    I believe it is about midway through.  Sorry, it's been

17   a while since I've looked at this.  So on page 11 of both that

18   document and of the binder, item one is notice of charges to

19   copy and respondent.

20     Q.    And how, according to Exhibit A, does UCLA define notice

21   of charges?

22     A.    Specifically, it says that if a formal investigation

23   will be conducted, the Title IX coordinator and dean will

24   jointly send written notice of charges, notice of charges, to

25   the complainant and the respondent.  The notice of charges will

1    include a summary of the allegations and potential violations

2    of the UC sexual violence and sexual harassment policy and the

3    UCLA code of conduct, the purpose of the investigation, a

4    statement that the investigation report when issued will make

5    factual findings, and a recommendation -- and a recommendation

6    regarding whether there has been a violation of the UC SV and

7    SH policy and the UCLA code of student conduct, a statement

8    that the findings and recommendation will be based on a

9    preponderance of the evidence standard, a summary of the

10   process under these procedures, including the expected

11   timeline, a summary of the rights of the complainant and the

12   respondent and the resources available to them.

13       Q.   As we sit here today, has the university, have you

14   received a copy of the notice of charges from Mr. Doe?

15       A.   I have not.

16       Q.   Do you have any loose exhibits, or do you just have the

17   binder?

18       A.   I do.  I have a loose exhibit.

19       Q.   You should have a document that is marked as Defendant's

20   Exhibit N.  Do you see that document?

21       A.   I don't think these are marked yet.  Is that the --

22   what's the date?

23       Q.   The date should be March 10, 2017.

24       A.   I have that.

25       Q.   Take a moment and look at that document and let me know

1    when you've had an opportunity to look it over.

2    A.    Yes.

3    Q.    Do you have an understanding of what that document is?

4    A.    This appears to be the notice of charges that I've been

5    asking for.

6    Q.    And if you could also -- there's another loose page that

7    should be dated May something of 2017.

8    A.    May 8th.

9    Q.    Yes.  Do you see that document?

10   A.    Yes.

11   Q.    Take a moment to look it over and let me know when

12   you've finished.

13   A.    Okay.

14   Q.    In the first paragraph of that e-mail, I believe there

15   is a reference to the March 10, 2017 letter that you just saw,

16   correct?

17   A.    Yes, there is.

18   Q.    What does it say?

19   A.    As stated in the March 10, 2017, notice of charges sent

20   by the Title IX coordinator and the office of the dean of

21   students.

22   Q.    And, if you recall, what was the date that Mr. Doe

23   submitted his application?

24   A.    June 22.

25   Q.    What did you do after you issued the March 15 letter to

1    Mr. Doe?

2      A.    Immediately after issuing that letter, again, one of the

3    things I mentioned before is that I have a pretty strict

4    protocol around how we handle these types of cases, both the

5    investigation and the administration of the cancellation of

6    registration and revocation of admissions, so Mr. Doe was

7    actually a somewhat unique case that he had classes that ran

8    all the way up until Friday afternoon so we issued him the

9    notice after 4:00 p.m. on Friday because that allowed me an

10   opportunity to reach out to the instructors and inform them as

11   well in a way that wasn't going to create confusion.

12         So immediate -- so I sent Mr. Doe the information at the

13   end of the day on the 15th, immediately canceled his

14   registration.  So from a timing standpoint if he were to

15   receive the e-mail and check the registration system, he would

16   see that it was already -- already canceled, and at that point

17   we deleted his record, pulled back all of the courses or grades

18   that he had already been issued as part of that admission

19   revocation process, and then at that time point notified his

20   instructors about the decision and gave them some background

21   information.

22     Q.    Did you have any further correspondence with Mr. Doe

23   after you sent the March 15 letter?

24     A.    No, I did not.

25     Q.    What is Mr. Doe's current status with the university?

1   A.   He is not a student, and we have no record of his

2   attendance.

3          MS. YANIKO:  I don't have any further questions at

4   this time.

5          THE COURT:  Thank you.

6          Cross-examination, Ms. Lau?

7                            - - -

8                      CROSS-EXAMINATION

9   BY MS. LAU:

10  Q.   Mr. Miner, the application that appears in Exhibit C and

11  C-1, can you turn to that, please?

12  A.   Yes.

13  Q.   Earlier you testified that the only variations you saw

14  on the application as compared to what the student provided

15  were the student I.D. number and the application number.

16         Was there any other variations that you are aware of?

17  A.   No, there are not.

18  Q.   And so are you testifying that this four-page document

19  is in the exact same format and form that would have appeared

20  on the screen, the computer screen for the student applying,

21  before they pressed send?

22  A.   The appearance would render differently on a computer

23  screen because it's a web form, but the information included is

24  identical.

25  Q.   And you were able to authenticate that this form, in

1   fact, was the form submitted or the application submitted by

2   Mr. Doe?

3       A.   Yes.

4       Q.   And how are you able to do that?

5       A.   This came directly from our student information system.

6       Q.   Did you have to consult with anyone at IT about that?

7       A.   No.

8       Q.   Do you believe that Ohio State's application questions

9   require the student to consult policies of any other

10  institution other than Ohio State's?

11      A.   Yes, actually.

12      Q.   Where does it say that in the application?

13      A.   I don't think it's a question of saying that, but I

14  think it really comes down to a student being able to answer

15  truthfully.

16          So, for example, if a student has been suspended or

17  dismissed from another institution for academic reasons, again,

18  they would need to know that that had happened from that

19  institution.

20      Q.   But that wasn't my question.

21          My question was where does it say on this application

22  that a student applicant has to refer to any policies outside

23  of the Ohio State policies?

24      A.   I think it would be implied by the truthful piece of the

25  application.

1    Q.   So it does not say that.

2    A.   No.

3    Q.   If you read further into the certification of the

4    application on page 4 of either C or C-1, you will notice that

5    there's a section that starts "applicable to all Ohio

6    State/Metro Academy Applicants," and then it refers to -- well,

7    the first sentence, if you could just read that first sentence

8    for me aloud?

9    A.   Under applicable to all Ohio State/Metro Academy

10   Applicants?

11   Q.   Yes.

12   A.   "I also agree to submit other materials which are

13   required for this admission application."

14   Q.   Can you also go to the second sentence, please?

15   A.   "I agree that, as a student, I will be subject to the

16   Ohio State University Code of Student Conduct."

17   Q.   So, in this certification, the applicant is being

18   referenced to the Ohio State student conduct, correct?

19   A.   Correct.

20   Q.   Okay.  Are you aware of how Ohio State defines

21   discipline charges?

22   A.   Roughly, but not directly.

23   Q.   I would like you to refer to attachment 5 of Exhibit J,

24   please.

25        MR. MARTI:  Do you have a page I.D. for that?

1          MS. LAU:  Oh, sure.  It's 169.

2     BY MS. LAU:

3     Q.    Let me know when you're there.

4     A.    Okay.  I'm there.

5     Q.    Can you please read to me that first paragraph under

6     charges?

7     A.    "After finishing the investigation, your hearing officer

8     will decide whether or not to issue charges.  If your hearing

9     officer issues charges, this doesn't mean that you have been

10    found in violation.  Rather, it means that the investigation

11    produced enough evidence that we're moving forward rather than

12    closing our file."

13    Q.    First, do you have any reason to dispute that this is an

14    accurate definition of charges under the Ohio State Student

15    Code of Conduct?

16    A.    I can't verify it, but I don't know either way.

17    Q.    Do you have any reason to believe that it's not an

18    accurate definition?

19    A.    Again, I don't know either way.

20    Q.    But it does, in fact, state on the document The Ohio

21    State University with the logo for OSU?

22    A.    Yes.

23    Q.    Is that definition different from the page you read from

24    UCLA's policies, page 11 of Exhibit A, in your understanding?

25    A.    I'm sorry, which --

1    Q.   If you go to Exhibit A --

2    A.   Okay.

3    Q.   -- page 11.

4         Earlier you were reading from one of UCLA's policies

5    about what notice of charges will include.

6    A.   I think they are two different policies.  I would argue

7    that they are somewhat similar.

8    Q.   How are they similar?

9    A.   In both cases there are a notice of charges.

10   Q.   Is that what The Ohio State University says as the

11   definition of what a charge is?

12   A.   It says after finishing the investigation, your hearing

13   officer will decide whether or not to issue charges.

14   Q.   Okay.  And if you look back at UCLA, one of its policies

15   on page 11, does that say at the conclusion of the

16   investigation?

17   A.   No, it does not.

18   Q.   In fact, if you read the paragraph before, it says if a

19   formal investigation will be conducted.

20   A.   Correct.

21   Q.   So do you understand that to mean at the beginning of an

22   investigation or at the conclusion of the investigation?

23   A.   My reading is the conclusion of the investigation would

24   be the notice of findings based on their version.

25   Q.   Is there a difference between an investigation versus a

1  charge in your mind?

2  A.  In my mind for the most part, no.

3  Q.  No.  You think they're one and the same?

4  A.  I think they could be the same.  If you're asking my

5  opinion, I think they could be the same.

6  Q.  Is that what OSU meant when it asked the question on the

7  application?

8  A.  I didn't write OSU's application, but I think OSU's

9  application is very clear.

10  Q.  Does it say investigation on the OSU application?

11  A.  No, it does not.  It says pending charges.

12  Q.  Who does write the application questions for OSU?

13  A.  It is our undergraduate admissions office and a

14  committee, including general counsel.

15  Q.  Do they consult with you when they are in the process of

16  determining what kinds of questions to put on the application?

17  A.  Yes.

18  Q.  Did they consult with you on the decision to put whether

19  a disciplinary charge is pending on the application?

20  A.  Again, that information has been there as long as I can

21  remember so no.

22  Q.  I want you to flip to Exhibit J, attachment 6, please.

23  Do you know what this document is?

24  A.  It appears to be a portion of our application.

25  Q.  Do you know in what year?

105

1    A.   I do not.

2    Q.   Can you read for me the application question, the second

3    one down on the page?

4    A.   Have you ever been suspended or dismissed from any

5    college or university for any disciplinary reason, or is a

6    disciplinary action from any college or university currently

7    pending against you.

8    Q.   Isn't that different from asking a student whether a

9    disciplinary charge is pending at another institution?

10   A.   Yes.

11   Q.   How is it different?

12   A.   It is different language and it is different versions of

13   our application.

14   Q.   What do you understand disciplinary action to mean?

15   A.   I think disciplinary action is inclusive of charges.

16   Q.   It's broader than charges, correct?  Is that fair to

17   say?

18   A.   Yes.

19   Q.   Could disciplinary action include investigations?

20   A.   Yes.

21   Q.   Is a student under a disciplinary investigation at Ohio

22   State presumed to be innocent or not responsible to the alleged

23   violation?

24        MS. YANIKO:  Objection.

25        THE COURT:  There's an objection.  This is the

1   registrar. Here's a high ranking official. He can give me his

2   view of it. And I don't mean to diminish the registrar, but in

3   the end this is going to be a legal question.

4         You may ask it and the registrar may answer it.

5          THE WITNESS: My assumption is yes, but I don't know.

6   BY MS. LAU:

7   Q.   Do you know if Ohio State issues discipline charges

8   against a student based on allegations alone?

9   A.   That's not my area.

10   Q.   Isn't it true that Ohio Administrative Code 3335-9-20 is

11   the applicable statute that you used to determine whether to

12   cancel or revoke Mr. Doe's registration?

13   A.   Yes.

14   Q.   And that statute requires you to find that there was

15   false or incomplete information submitted at the time of the

16   application, correct?

17   A.   Yes.

18   Q.   Isn't it true that you did not possess a single document

19   that demonstrated that plaintiff submitted false information on

20   his application?

21   A.   I believe that there is incomplete information on the

22   application.

23   Q.   And what is the basis of that determination?

24   A.   I specifically multiple times, based on information that

25   we are able to obtain from UCLA as well as information from the

1    student, believe and believed at the time that there was a

2    charge date and that the student was aware that they were

3    subject to pending charges at UCLA at the time that they

4    applied to Ohio State and, therefore, provided incomplete and

5    false information on that application.

6        Q.   So you're basing that determination on your reading of

7    Exhibit A?

8        A.   No.  Actually on the information that the -- that

9    Mr. Doe provided to us.

10       Q.   So the absence of a document labeled notice of charge is

11   what you determined was information sufficient to satisfy that

12   there was incomplete information provided?

13       A.   I think it's twofold.  It is both the information that

14   was provided to us that shows that a notice of charge would

15   have happened prior to the dates of the documents that he gave

16   us and, again, part of the application process is an

17   expectation that the student provide complete and accurate

18   information, and in this case the student was not providing

19   complete or accurate information.

20       Q.   But aren't you using the UCLA policy that's referred to

21   in Exhibit A as the basis for making that determination when

22   reading Mr. Doe's application responses?

23           MS. YANIKO:  Objection; asked and answered.

24           THE COURT:  Overruled.  You may answer it.

25           THE WITNESS:  I'm using primarily the information that

1    Mr. Doe provided to us.  And, again, specifically I wasn't just

2    asking for a document but was specifically asking for the date

3    of the charges and never received that.

4        BY MS. LAU:

5        Q.   But if the plaintiff did not possess a document labeled

6    notice of charges, isn't it true that he could not provide you

7    with such document?

8        A.   I think that goes back to the evasive conversation, that

9    it would have been an opportunity for the student to have

10   provided that information to us instead of providing other

11   documents or other information or no information at all.

12       Q.   But what would he provide if he doesn't have the

13   document?

14       A.   He could have provided information.  One, helpful thing

15   would have been an opportunity for us to have had a

16   conversation with UCLA.  That was the reason that we pursued

17   the FERPA disclosure.  And, again, we received information from

18   UCLA that the student had specifically asked them not to share

19   information about the charge date.

20       Q.   But isn't it true there are no restrictions on the FERPA

21   release that he signed over to OSU to access his records at

22   UCLA?

23       A.   But, again, if the student had asked or warned another

24   institution not to share that, they did not feel comfortable

25   doing so in the situation they were in.

109

1    Q.   Did you have evidentiary proof, anything in writing that

2    showed that Mr. Doe had refused to provide UCLA with

3    authorization to give you the information?

4    A.   No.  And, again, I was stuck in the situation that we

5    could not get information from UCLA and that the student was

6    also not providing the information.

7    Q.   Can you tell me about the last time that a student had

8    his or her registration revoked from OSU in Autumn of 2018?

9    Tell me a little bit about the facts without providing the

10   actual name.

11        MS. YANIKO:  Objection; relevance.

12        THE COURT:  How many times a year does this happen?

13        I'm going to ask a couple preliminary questions to see

14   if this is going to take us anywhere.

15        Does this happen often?

16        THE WITNESS:  It happens about twice a year.

17        THE COURT:  With that in mind, you may inquire.

18   There's not a whole lot of poling here to get into.

19   BY MS. LAU:

20   Q.   I just want to understand how similar or different that

21   case was.

22   A.   I believe the last case that I remember us looking at --

23   and, again, some of them run together at some point, but the

24   last case that I remember us looking at was a student who had

25   not provided complete academic information and had left off

1  information about a prior institution.

2      Q.   And did that student admit to leaving off the --

3      A.   They did.

4      Q.   I'm sorry, leaving off the institution that it came

5  from?

6      A.   They did.  And, again, that was the case where the

7  student was not dismissed.

8      Q.   I want you to turn to Exhibit D, please, and if you can

9  flip to the first page of your letter of October 18, 2018.

10     A.   Uh-huh.

11     Q.   If you'd go down the page to the paragraph beginning

12  "because of this".

13     A.   Yes.

14     Q.   Can you please read that aloud?

15     A.   "Because of this, the university has reason to believe

16  that disciplinary charges were pending against you at the time

17  of your application, and it appears that your response to this

18  question was false at the time you submitted your application."

19     Q.   So is it fair to say that you were investigating whether

20  there was disciplinary charges, not disciplinary

21  investigations?

22     A.   Yes.

23     Q.   Can you flip to Exhibit E, please?  Can you look to the

24  second sentence of the first paragraph beginning with "I

25  asked"?

111

1    A.    I asked redacted for my records two months ago and

2  redacted should be releasing the records to me any time now.

3    Q.    And can you read the next sentence for me?

4    A.    I would like to have an opportunity to review my FERPA

5  student records so that I can provide a complete response to

6  you.

7    Q.    Do you think it's unreasonable for a student to be able

8  to review his own student record before providing access to

9  that record to third parties?

10    A.    Not at all.

11    Q.    Do you believe that plaintiff refused to give you the

12  FERPA release?

13    A.    Yes.

14    Q.    So even after reading his explanation here in this

15  exhibit, you still believe that he was refusing to give you his

16  FERPA release?

17    A.    I believe he gave us the document, and I believe he

18  contacted UCLA and asked them to not provide full information.

19    Q.    What are you basing that on?

20    A.    It is from our experience and conversations with UCLA.

21    Q.    But not because of anything that you've seen in writing

22  or from Mr. Doe.

23    A.    From Mr. Doe all I received was the FERPA release that I

24  had been asking for for a while at that point.

25    Q.    But, again, isn't he just explaining that he's going to

1   review the records before he gives them to you?  He's not

2   refusing to provide those records to you, is he?

3       A.   In this notice, he was not.

4       Q.   He was not what?

5       A.   Refusing to provide those records to us.

6       Q.   Thank you.

7            Earlier you testified that at some point during the

8   admissions investigation and Mr. Doe's application, you started

9   looking to UCLA policies to understand the process.

10      A.   Yes.

11      Q.   How did you know what policies to review?

12      A.   I started that process when Mr. Doe provided the

13  October 23 letter.  Until that point I wasn't completely sure

14  what the charges were or what had happened.  But when he

15  provided the October 23 finding document, that led me down the

16  path of if this is a finding, there must have been charges at

17  some point and the student must have been notified of the

18  investigation at some point so I looked to the UCLA policy to

19  confirm that they did, based on their policy, inform the

20  student of investigation and charges prior to issuing the

21  finding.

22      Q.   But that's not what I asked you.

23           I asked you how did you know what policy of UCLA

24  policies to review?

25      A.   Because of his October 23 letter to me -- or the

113

1  October 23 letter from UCLA to the student that he submitted to

2  me.

3      Q.    Are you aware that there is more than one policy that

4  applies to UCLA students who are undergoing a Title IX

5  investigation?

6      A.    I did not.

7      Q.    Did you look on UCLA's website to see whether there were

8  other policies that applied to Title IX investigations?

9      A.    I looked at the sexual misconduct policy that was

10 referenced in Exhibit A.

11     Q.    Well, actually, this is the student conduct procedures,

12 correct, if you look to Exhibit A and the cover of that policy?

13     A.    Yes.

14     Q.    That's the student conduct procedures.

15     A.    Yes.

16     Q.    So is it fair to say you did not look at any other

17 policies or procedures at UCLA that applied to Title IX

18 investigations?

19     A.    Correct.

20     Q.    Let's take a look at Exhibit Defendant N, as in Nancy,

21 exhibit.

22     A.    Yes.

23     Q.    Earlier you testified that this appears to be a notice

24 of charges.

25     A.    Correct.

114

1    Q.   Where does it say that?

2    A.   It does not say the words notice of charges, but all of

3 the information is consistent with the policy and a layman's

4 reading of this is it is a notice of charges.

5    Q.   At the time that you were investigating Mr. Doe, were

6 you aware that communications like the one you are holding,

7 March 10, 2017, are no longer accessible by the student beyond

8 24 hours of receipt?

9    A.   No.  The student never shared that with us.

10    Q.   Would that have been relevant to your investigation?

11    A.   It would have been relevant because the student would

12 have at that opportunity again -- as I referenced before, I

13 wasn't at that point necessarily asking for the document.  I

14 was asking for the date that the student was made aware of the

15 charges.  So had the student said yes, on March 10 I was

16 notified of the charges but I don't have a copy of that, that

17 would have at that point in the process been the information

18 that I was looking for.

19    Q.   Wouldn't the fact that correspondence from UCLA to its

20 students during the Title IX process was inaccessible beyond 24

21 hours, wouldn't that fact also be relevant for what the

22 applicant intended at the time they submitted the application

23 to OSU?

24    A.   In my opinion, no, because in my opinion, again, we're

25 not asking for the documents.  We're asking for the student to

1    answer the questions truthfully, and based on this document the

2    student would have known that there were charges pending

3    against them.

4    Q.   But isn't the question that was at issue in your

5    investigation what Mr. Doe knew at the time he applied to OSU

6    in filling out his application to be truthful or complete?

7    A.   Yes.

8    Q.   So if he did not have access to documents that would

9    corroborate certain pieces of information at the time that he

10   was applying, wouldn't that be relevant to what he knew at the

11   time he applied?

12   A.   The documents wouldn't be relevant.  Again, we would

13   be -- we were asking the information about whether or not

14   charges were pending.  We were not at that point asking for the

15   document to prove that the charges were pending.  We were

16   asking were there charges pending.

17   Q.   So if the student was unaware if the charges were

18   pending, you still would have expected this student to answer

19   differently on this particular question?

20   A.   I would be amazed if a student didn't know that charges

21   were pending against them if there were.

22   Q.   The document you're holding is the document that opened

23   the investigation for UCLA.  It doesn't say notice of charge on

24   it, correct?

25   A.   Correct.

116

1     Q.    How do you understand that to provide notice to the

2    student that he or she is under charges at that time?

3     A.    Again, as a university registrar versus an attorney, my

4    reading of this and having been a student at one point, my

5    reading of this is that it is a notice of charges.

6     Q.    Even though it doesn't say charge on it?

7     A.    Yes.

8     Q.    Did plaintiff earn any credit subsequent to the

9    cancellation of his admission?

10     A.    No.

11     Q.    So plaintiff earned all his credits from Ohio State

12    prior to cancellation?

13     A.    Actually, cancellation goes back to the original date of

14    admission so the student has not earned any credit at

15    Ohio State.

16     Q.    Where are you getting that explanation from?  Is that

17    your interpretation of the statute?

18     A.    Yes.  So the statute allows that when registration is

19    canceled -- or when admission is revoked, anything beyond the

20    original admission date was not earned.

21     Q.    Will you turn to Exhibit D, the last page -- I'm sorry,

22    the second to the last page of that exhibit?

23     A.    Yes.

24     Q.    Can you read aloud from the sentence starting with "no

25    credits earned"?

117

1    A.   No "credits earned subsequent to such cancellation and

2  prior to proper admission or registration shall be entered upon

3  the permanent record of the student.  Students whose admission

4  or registration is canceled are not entitled to any refund of

5  fees."

6    Q.   Let's just take the first part of that sentence.  It

7  says no credits earned subsequent to such cancellation, and

8  you've testified that Mr. Doe earned no credits subsequent to

9  such cancellation, correct?

10    A.   Correct.

11    Q.   Now, what about that second half of the sentence "and

12  prior to proper admission and registration"?  How do you -- how

13  does that -- what does that mean in a situation like this?

14    A.   In a situation like this, it means that the student was

15  essentially not properly admitted to Ohio State so the date

16  that we notified the student is not the date of any change of

17  their admission status.  It revokes their admission status back

18  to the initial date when we would have admitted the student.

19    Q.   So you're saying the date that you notified Doe about

20  the cancellation is not the date that's operative?

21    A.   The process revokes any registration that the student

22  has had at the university.

23    Q.   You're saying the cancellation date is the beginning

24  of -- like the beginning of the student's application?

25    A.   Yes.  Because the student was improperly admitted to the

118

1    university.

2    Q.    But where does it --

3    A.    Had the student not falsified or provided incorrect

4    information, they wouldn't have been a student at Ohio State,

5    somebody else would have, and they never would have earned

6    those credits.

7    Q.    Where does it say in this statute that the cancellation

8    date is the same as being properly admitted?

9    A.    That is and has been the university and the state's

10   interpretation of that rule.

11   Q.    But that's not what it says, correct?

12   A.    I believe it is what it says.

13   Q.    It says a cancellation date is the same date as the

14   proper admission date?

15          MS. YANIKO:  Objection; asked and answered.

16          THE COURT:  This is going to be subject to legal

17   argument.  He's not giving a legal opinion as he's testifying;

18   he's giving factual testimony.

19          MS. LAU:  Can I consult briefly with my co-counsel?

20          THE COURT:  You may.

21          MS. LAU:  No further questions.

22          THE COURT:  Thank you.

23         Redirect?

24          MS. YANIKO:  Thank you.  Briefly.

25

119

1                                - - -

2                        REDIRECT EXAMINATION

3      BY MS. YANIKO:

4      Q.    Okay.  There was some testimony that you gave earlier

5    about communications between the university and UCLA pertaining

6    to what information UCLA was authorized to provide to the

7    university.  Do you recall that testimony?

8      A.    Yes.

9      Q.    And, if I recall your response accurately, you stated

10   that you yourself did not have any written correspondence from

11   UCLA, correct?

12     A.    Correct.

13     Q.    If you could turn to Exhibit B in the binder, please,

14   and skip past the first two pages and go to pages 3 through 5.

15     A.    Yes.

16     Q.    Have you ever -- take a minute to look at it, and then

17   I'm curious if you've ever seen this before.

18     A.    I have not.

19     Q.    Did you have any communication with Krystal Reeb during

20   the course of time that you were requesting and receiving

21   information from Mr. Doe while looking into the accuracy of his

22   application?

23     A.    I did.  There was -- if you notice the progress of this,

24   there was kind of a period of time where there was a bit of a

25   lull in activity and back and forth in the documentation, and

120

1    during that time the office of student conduct obviously was

2    working with UCLA and we talked about that back and forth, as

3    well as through our legal affairs office, and in each case

4    found out that they were not able to get information from UCLA

5    because the student had asked UCLA not to provide it.

6        Q.   You were also asked some questions about Defendant's

7    Exhibit N, which is that March 10, 2017 letter.

8        A.   Yes.

9        Q.   Do you have the letter?

10       A.   Yes.

11       Q.   And the questions were asking you whether the words

12   "notice of charges" appear in this document.

13       A.   Yes.

14       Q.   If you could turn to Exhibit O, which is the May 2017

15   letter, May 8th, 2017.

16       A.   Yes.

17       Q.   Could you read the first sentence of that letter?

18       A.   "As stated in the March 10, 2017 notice of charges sent

19   by the Title IX coordinator and the office of the dean of

20   students."

21       Q.   So going back to the March 10, 2017 letter which is

22   Exhibit N, who do you understand that this document was sent

23   to?

24       A.   This document was sent to Mr. Doe.

25       Q.   And when do you understand that this document was sent

121

1    to Mr. Doe?

2       A.   March 10, 2017.

3       Q.   And there was some testimony earlier that Mr. Doe didn't

4    have access to this particular document 24 hours after he

5    initially accessed it.  Do you recall that testimony?

6       A.   Yes.

7       Q.   Have you heard anything today that makes you believe

8    that Mr. Doe never saw this document?

9       A.   No.

10       Q.   And then with the May 8th, 2017 letter, who was this

11   document sent to?

12       A.   It appears to be Mr. Doe.

13       Q.   And when was this document sent?

14       A.   May 8th, 2017.

15       Q.   And did you hear anything today that made you believe

16    that Mr. Doe never saw this document?

17       A.   No.

18       Q.   So then when Mr. Doe completed and submitted his

19    application to OSU on June 22, I believe is the date, of 2017,

20    is it your understanding he would have seen both of these

21   documents?

22       A.   Yes.

23       Q.   So perhaps didn't have access to them at the time he

24    completed his application, but had seen them.

25       A.   Had seen them.

122

1    Q.   There were also some questions about some different

2    personal history questions from some point that appeared to

3    relate to OSU.  Do you recall those questions?

4    A.   Yes.

5    Q.   From your testimony earlier, I understand that the

6    application questions from Mr. Doe's application did not change

7    for the cohort of students who applied at that time, correct?

8    A.   Correct.

9    Q.   Do you have any way of knowing where the questions you

10   were shown did come from or when they would have been created?

11   A.   I believe that we have updated the language of the

12   questions for the application that is current right now for the

13   2019 incoming class, but I am not -- I have not reviewed that

14   enough because I haven't started seeing applicants come through

15   enough to verify that that was the language shown.

16   Q.   You were also asked some questions about Ohio

17   Administrative Code Rule 3335-9-20.  The process that Ohio

18   State University applied as to Mr. Doe, is that the same

19   process that The Ohio State applies to any other student for

20   whom the university revokes registration and admission?

21   A.   Yes.  That is the identical code that we refer to and

22   the identical process that we have used, again, in my entire

23   time both in this role and in my 20 years in the office

24   previously.

25        MS. YANIKO:  I don't have anything else at this time.

123

1          THE COURT:  Thank you.

2      Recross?

3                       - - -

4                 RECROSS-EXAMINATION

5   BY MS. LAU:

6   Q.   Mr. Miner, just one question.  Do you believe that a

7   student receiving communications and having 24 hours to review

8   it would commit to memory every single word of that document?

9   A.   Whether or not the student committed every single word

10  to memory, I believe they would understand the intention of the

11  document and understand what the document meant.

12  Q.   So even if a document did not call itself a notice of

13  charge, you would still believe testifying under oath today

14  that a student reading it would just automatically assume that

15  that is a notice of charge?

16  A.   Based on the document that you've provided and my

17  reading of it just today, I would assume that that is a notice

18  of charges.

19  Q.   Even though there is no word charges listed anywhere on

20  that document.

21          MS. YANIKO:  Objection; asked and answered.

22          THE COURT:  That was the fourth question after you

23  were going to ask one, but I'm going to overrule the objection.

24      You may answer it.

25          THE WITNESS:  Could you repeat that?

124

 1    BY MS. LAU:

 2    Q.    So you believe that the student should understand the

 3    March 10, 2017 letter as a notice of charge even though the

 4    word charge does not appear anywhere on that document?

 5    A.    Absolutely.

 6          THE COURT:  Mr. Miner, thank you very much for being

 7    here.  You may step down.

 8          Anything additional from the defendants?

 9          MR. MARTI:  Just moving exhibits, Your Honor.

10          THE COURT:  Any objection to any of the identified

11    exhibits?  I believe that would be A all the way through P.

12          Any objection?

13          MS. LAU:  No.

14          THE COURT:  They'll all be admitted without objection.

15          MR. MARTI:  Thank you, Your Honor.  We'd rest then,

16    Your Honor.

17          THE COURT:  Thank you.

18          Anything additional from the plaintiff?

19          MS. LAU:  Just to be heard for legal argument.

20          THE COURT:  Yes.  And I am going to put a time limit

21    on both of you because I think I understand the issues here.  I

22    think all of you do as well.  You've educated me.

23          But, Ms. Lau, you may do brief summation, if you wish.

24          MS. LAU:  Thank you.

25          Mr. Doe became a student at OSU nearly two years ago in

1   2017.  He was a model student, named to the dean's list twice,

2   and on scholarship the last year.  He was even selected for a

3   prestigious all expenses paid internship for the summer.

4       But on March 15, as you've heard testified to today, OSU

5   canceled plaintiff's admission and terminated his enrollment

6   clawing back nearly two years of credits along with it,

7   stripped him of his scholarship, and foreclosed him of the

8   summer internship.  He is now going to --

9       THE COURT:  One thing I would say.  If we're looking

10  at the four-part test for a preliminary injunction, that would

11  be the harm.  I think on that point there's no dispute.  There

12  is substantial harm here.  That's one of the four.  I agree

13  with you on that so I'd encourage you to focus on the other

14  three.

15      MS. LAU:  Okay.  Fair enough, Your Honor.

16      THE COURT:  And you were headed in that direction.

17      MS. LAU:  I was.

18      And so I would ask you to think about what would cause

19  the school to engage in such conscience shocking deprivations.

20  It's not what OSU described as alleged allegations by other OSU

21  students for Title IX.  It was a news article.  And once they

22  found out about this news article disclosing that Mr. Doe had

23  been found responsible at some later time at his former

24  university, they wanted nothing to do with him.

25      THE COURT:  But you would agree the UCLA procedures --

1    or, actually, I'm sorry, the -- yes, are very similar to the

2    Ohio State procedures for discipline regarding sexual

3    misconduct.

4              MS. LAU:  No.  No, I disagree.

5              THE COURT:  As a general matter, would you agree?  I

6    don't mean about notice and charges.  I mean about just the

7    general process, the burden of proof, the methodology of

8    investigations and conclusions, they're fairly similar, aren't

9    they?

10             MS. LAU:  Your Honor, the burden of proof is the same,

11   and I can testify that I've actually, you know, been on the

12   insides of these cases across the country.  I know what these

13   processes look like across universities, but every university

14   has a different process.

15             THE COURT:  That's a nuance.  But my point simply is

16   if Ohio State had the same process and expelled him, they

17   wouldn't give him any of his credits.  And their pitch simply

18   is, to play devil's advocate, we want to know if someone did

19   this before someone gets to our school because if we would have

20   expelled them for the same conduct, we're certainly not going

21   to accept them as a transfer student.

22             MS. LAU:  So are you asking if he was expelled for

23   Title IX violations at OSU, whether he would expect to retain

24   his credits?

25             THE COURT:  Well, in other words, we agree that the

127

1    harm to him is severe and irreparable, but the question is

2    whether it was justified.  That's really what we're -- do you

3    have a substantial likelihood of success on the merits?

4         MS. LAU:  And we believe we do based on the pure plain

5    reading of their application question that they're positing is

6    the application in Exhibit C.

7         THE COURT:  Assuming I take their version, the

8    language, to be specific, asks if he had been subject to a

9    disciplinary charge.  I know he's disputed that to a certain

10   extent with the screenshot, but at this point just assume I'm

11   going to find that that's the question in, I believe it was C

12   of the defendant's exhibits.  So then our issue becomes did he

13   know he was subject to a disciplinary charge.

14        MS. LAU:  Right.

15        THE COURT:  So for that purpose, I understand your

16   argument that the March 10 letter doesn't say charge anywhere,

17   but the May 8th letter starts out by calling the prior letter a

18   notice of charges, the same language used in the Ohio State

19   application.  Right?

20        MS. LAU:  It does.  It does, Your Honor.  But it's a

21   little more complex than that.  This application question

22   assumes that the applicant -- it makes a lot of assumptions

23   about what the applicant knows at that time when he or she is

24   applying.  It assumes that the terms disciplinary charge are

25   the same universally everywhere.  It does not --

128

1          THE COURT:  Right.  But there's something a little bit

2    odd here in that if we're talking about a student, a layperson

3    filling this out, but we're talking about somebody filling this

4    out with the assistance of counsel.

5          MS. LAU:  That's correct.

6          THE COURT:  That puts a different cast on it, doesn't

7    it?

8          MS. LAU:  It does in the sense that it was viewed by

9    both to be honest and truthful before he submitted his

10   application questions.  When you look to what -- understanding

11   the logic behind the application question, that's what Ohio

12   State deems as important for it to determine whether or not to

13   admit somebody.  That's what they're interested in learning.

14   It's not based on another school's definition of charge.  When

15   you look to Ohio State's definition of charge, they define it

16   completely different than UCLA.

17         THE COURT:  Right.  But if they were on notice that

18   all this was pending, they would have been able to investigate

19   before they made a decision, and all this harm we've just

20   talked about wouldn't have happened.  But because of the way

21   the question was answered, from Ohio State's standpoint -- I

22   can hear their argument coming -- this was kind of invited

23   error; that it took longer to find out, therefore the harm was

24   greater.

25         How do you respond to that?

1          MS. LAU:  How I respond to that is they are the

2     draftsman of this application, this contract.  They could have

3     asked for something different if they wanted to.  In fact, they

4     have changed their questions since this application.  They know

5     what to say when they want to ask for more information.  They

6     asked for a charge.  They did not ask for an investigation.

7     But they've conflated the two terms repeatedly throughout their

8     memorandums of law, repeatedly on the stand with Mr. Miner

9     discussing investigations and charges as one and the same.

10    They are clearly not.  That's why they are two different words.

11    And they could have used the term investigation on their

12    application.  They did not.  They could have said to look to

13    your former institution's definition of charges to determine

14    what a charge is.  They did not.  It is not reasonable for an

15    applicant, a 19 or 20 year old in this position, or even

16    counsel reading this application, to know that references to

17    the Ohio State code later in the certification statement

18    combined with testimony from Jack Miner saying that there is a

19    website that's dedicated to transfer students providing them

20    assistance.  They're discussing what Ohio State wants and what

21    their policies are, not what another school's is.

22          THE COURT:  Before we wrap this up, I'm going to ask

23    you a question that's on my mind.  The issue here is whether

24    there were disciplinary charges pending.  And, to be blunt, the

25    only document that I can see that Mr. Doe has received is one

1  you went to some lengths to make sure I didn't see.  That's the

2  May 8th, 2017 letter.  How do you respond to that?

3       MS. LAU:  Because we did not want an adverse or an

4  unjustified, unreasonable understanding of what that meant

5  without the context.  We would have to have explained much more

6  about what that means when we're not the draftsman of either

7  UCLA or Ohio State.  We cannot control how UCLA defines at whim

8  what a document is when they don't label it, but then in a

9  subsequent document they refer back to it as if it did have a

10  label on it.

11       THE COURT:  I again note, though, this would have been

12  reviewed not just by Mr. Doe, but by Mr. Doe's attorney.  So

13  anyway, I hear your argument.  Truthfully, I don't accept it.

14       But anything else before I hear from the state?

15       MS. LAU:  Your Honor, even the subsequent

16  communication after the May 8th letter -- that's why we gave

17  you both, we gave you the May 8th letter and we gave you the

18  July 14 letter -- refers to the March 10 letter differently.

19       THE COURT:  All right.

20       MS. LAU:  So how do we see all these facts and believe

21  that someone in plaintiff's position, having no access to any

22  documents at that time from UCLA, would have understood this is

23  what the application for a different school meant, that he was

24  supposed to go back not only to UCLA's policy at issue in

25  Exhibit A but also remember every single document and every

1    single word that was in those documents?  He did not understand

2    he was under charges.  He's testified to that.  No one at UCLA

3    had ever told him he had been under charges.

4        THE COURT:  All right.  Thank you.  You'll get the

5    last word.  It's your motion.

6        Mr. Marti?

7        MR. MARTI:  Thank you, Your Honor.

8        THE COURT:  Let me ask you a question:

9        In your view, would it be accurate for me to assume that

10   it's the falsity of the statement, not the intent of the maker

11   of the statement?  Or do you believe it requires both?

12       MR. MARTI:  I think it's the content of the statement

13   itself; is it accurate, is it complete.  And we have neither of

14   those here, Your Honor.

15       THE COURT:  But if somebody made a mistake, how would

16   you view that?

17       MR. MARTI:  I mean, I think at that point the

18   university has discretion to say, well, you know, we will weigh

19   that.  I think Mr. Miner testified sometimes that happens.  But

20   this is -- Ohio State was well within its discretion to say

21   this wasn't an honest mistake here.  These are matters of great

22   consequence.  We have now finally months later clear

23   documentary evidence that there were charges out there.  The

24   fellow's assisted by counsel.  This isn't an innocent error.

25   This is, I think in our view, a conscious attempt to skirt what

132

1   the application is trying to accomplish.

2        So going through the preliminary injunction factors, the

3   four-point test, the first is probability of success on the

4   merits.  And the primary claim here is a vagueness claim, and

5   that requires that the statute be so vague that the person

6   applicable to it just doesn't know what to do, doesn't

7   understand what's being required.

8        Well, putting aside all the UCLA stuff which we'll get

9   to in a minute, the common understanding of a charge is an

10  allegation of wrongdoing, a particularly bad, serious

11  wrongdoing.  I don't think anybody would dispute that when a

12  state government body, a state university has said you've

13  engaged in sexual misconduct --

14       THE COURT:  Well, there is a little ambiguity, you

15  would agree.  In other words, if we analogize this to the

16  criminal system, somebody could walk into a police station or a

17  prosecutor's office and say I think Mr. Marti broke my nose, he

18  punched me in a fight.  That could be a charge or it could be a

19  complaint.  It could be a complaint that leads to an

20  investigation that then leads to formal legal charges.  So the

21  word itself is not particularly clear, at least in the March 10

22  letter.  But I'm assuming you're relying more on the subsequent

23  May 8th letter that does use the word charge.

24       MR. MARTI:  I mean, I'm not necessarily -- I think we

25  get there regardless of the letters.  You know, the test for

1     vagueness is not mathematical, it's not precise.  It's do you

2     get the gist of what the government is asking for.  And the

3     gist is is there something bad in your -- is there some

4     official inquiry into bad conduct in your past, and that's what

5     we have here by any stretch of the imagination.  Furthermore,

6     it's underlined by the plaintiff's own conduct here.  He

7     testified here this afternoon that he knew this was serious

8     business.  In fact, he went out and hired counsel to respond to

9     it.  You don't hire counsel just because it's something, you

10    know, passing.  It's because you're charged with something.

11    You're facing a serious allegation.  And, in fact, the

12    statement from his counsel in the record, the to whom it may

13    concern statement, says we're facing accusations, and an

14    accusation is generally considered to be synonomous to a

15    charge.

16          So that's one ground which I think is sufficient to get

17    us there by itself.

18          But, in addition to that, in this case you have specific

19    charges or a specific notice of charge from a government body.

20    It's hard to dance around that; although, the plaintiff did his

21    best.

22          So I think, particularly given the procedural posture

23    we're in, we're asking for interim injunctive relief, mandatory

24    injunctive relief.  The plaintiff has to show clearly that the

25    statute was unconstitutional.  I don't see that they even got

134

1    to the basic point, let alone a clear case of

2    unconstitutionality.

3          Now, moving to public interest. You know, we're talking

4    about a public institution here, and the public interest is

5    implicated in a couple ways.

6          First of all, the slot that Mr. Doe took somebody else

7    didn't get. There are a lot more people that want to get into

8    Ohio State than Ohio State is able to accommodate. So when

9    somebody misleads Ohio State in the application process, third

10    parties, the public are harmed. The educational resources

11    aren't used as effectively as possible. And this particular

12    type of -- the subject of this misconduct, in particular,

13    universities have a federal law obligation to be on the alert

14    for risks of sexual misconduct to their other students, and

15    then we have a situation where somebody went out of their way

16    to hide that and that makes it much harder for Ohio State to

17    meet its federal law obligations and that's not in the public

18    interest.

19          And then moving to the Clean Hands Doctrine, I mean,

20    here we are, what, six, eight months later from when Ohio State

21    first asked for this very basic piece of information, this very

22    basic record that was at least in the possession of Doe's

23    counsel, and the only way we get it is it's grudgingly given

24    after a federal judge suggests strongly that it should. We

25    suggest that's unclean hands. So regardless of whether they

1    met the other standards for preliminary injunction, that

2    precludes them in its own right.

3           That's all I have unless the Court has questions.

4           THE COURT:  No, that's fine.

5           MR. MARTI:  Thank you, Your Honor.

6           THE COURT:  Ms. Lau, I promised you the last word.

7           MS. LAU:  I have a brief rebuttal.

8           OSU really is not understanding the plaintiff's

9    vagueness argument.  Our vagueness argument isn't with regard

10   to the definition of charge itself.  It's whose definition of

11   charge prevails and is operative when answering a question on a

12   transfer application to another institution, and we submit that

13   it's not clear from this application and it did not provide

14   sufficient notice that it would be UCLA's policies and

15   definitions, not Ohio State's.

16          Also, we take issue with the vagueness of the statute

17   that was used to revoke Mr. Doe's registration as well.

18          The statute, as we've read to you aloud to the Court is

19   simply just not -- it's incomprehensible.  It is not at all --

20   it does not at all say what Mr. Miner testified he believed it

21   meant.  And, again, this goes to the draftsmen and what

22   Ohio State can do to make things clearer for a student.  In the

23   application itself they put in the certification that same

24   statute.  If they wanted to be clear that all credits would be

25   revoked prior to the person's admission, so prior to

1   cancellation, that's really what it should have said.  It said

2   subsequent to cancellation.

3           THE COURT:  Well, to be blunt, that might be a claim

4   for damages, right?  Is that a basis for an injunction on a

5   temporary basis?

6           MS. LAU:  It is.

7           THE COURT:  Well, it's money make up, isn't it?  It's

8   not irreparable harm of being removed from a university.

9           MS. LAU:  It is because it will look like a two-year

10  gap on his record.  He will not be able to move anywhere

11  without having to explain that gap.  And the cases show that

12  you have -- if you have to continually perpetually explain to

13  future employers and future institutions why there is this gap,

14  and we're not talking about a small gap we're talking about two

15  years, of course they're going to ask what happened here.

16  They're going to not only get to the Ohio State application

17  issue, they're going to get to the underlying Title IX issue at

18  UCLA that's being challenged in the courts of California.  So

19  it will cause irreparable harm to his education future.  He

20  will not be able to transfer.  He will be held hostage until

21  the end of this lawsuit to determine whether, in fact, that can

22  be the case, whether he can be made whole.

23          THE COURT:  All right.  Thank you.

24          MS. LAU:  Thank you.

25          THE COURT:  I am going to issue a ruling from the

1   bench.

2       I want to address, first of all, several factual issues.

3       The first is the question of what did the application

4   for admission as a transfer student actually say.

5       There are two potential versions of that.  One would be

6   the screenshot submitted by the plaintiff.

7       I do think the plaintiff was candid.  He mentioned in

8   cross-examination that he couldn't rule out that the screenshot

9   could have involved another school.  I'm going to compare that

10  testimony to the testimony of the registrar Mr. Miner, who said

11  that this is exactly what is stored in the records of

12  Ohio State, and that this was the form he was familiar with for

13  the year in question.  So I am going to find that the question

14  in Exhibit C of the defendant's exhibits on the last page of a

15  four-page application and the issue before me has to do with

16  the second question, and I quote it, "Have you ever been

17  suspended or dismissed from any college or any university for

18  any disciplinary reason, or is a disciplinary charge from any

19  college or university currently pending against you," so that

20  becomes the operative language for my analysis whether or not

21  the plaintiff was truthful when he answered no to whether there

22  was a disciplinary charge currently pending against him.

23      The next question then becomes on June 22, 2017, when he

24  submitted the application for permission to be a transfer

25  student, was the information false?

138

1    We'll take that separately.  And then the other is did

2  he know it was false or have reason to believe that it was not

3  fully accurate.

4    There are three documents that inform the answer to this

5  question, and there's probably a fourth because the plaintiff

6  also testified that in February of 2017, he had received a

7  notice that was a mutual no contact order that was dated

8  February 16, 2017.  I'm going to go through a series of

9  letters, all that predated the submission of the application on

10 June 22 of 2017.

11   So we start with a no contact order.  That did not

12 mention charges in an official way, but it indicated that there

13 was a proceeding underway.

14   The next letter was a letter dated March 10, 2017, and

15 these are all from the University of California at Los Angeles.

16 That letter is three pages long and indicated that there had

17 been a matter referred for an investigation.  On page 2 the

18 document outlines the investigative procedures that would

19 follow, and the reference on page 1 is to violations that

20 threaten health or safety or involve sexual harassment.  So

21 they are noted as serious matters.

22   In the Court's view, that would fit the definition of a

23 disciplinary charge, but I would say I have a somewhat firm

24 view of that.

25   The next letter, May 8th, 2017, I believe, puts any

139

1    doubts to bed because it starts out in the very first sentence

2    addressed to the plaintiff, and it refers to the earlier letter

3    as a notice of charges.  So the same wording in the Ohio State

4    application about charge or charges is in the May 8th, 2017

5    letter, and there is a subsequent letter on June 14, 2017,

6    again relating to an investigation.  I note again the word

7    charge is not included in that, but this, in the Court's view,

8    is just additional confirmation of the other two letters, and

9    particularly the letter of May 8th, 2017.

10           So as of the date the application was filed, June 22,

11   2017, the plaintiff had received at least four letters from the

12   university describing this process.  One used the word charge,

13   one was an order to have no contact with the complainant.

14           I also, as I mentioned, note that the plaintiff used a

15   lawyer to fill out the application which, in the Court's view,

16   means that if we are bogging down on what otherwise might be

17   technical terms to a layperson, I don't take the same view when

18   a lawyer is part of the process.

19           Bluntly, I think there was some hiding of the ball here.

20   I think, particularly the May 8th, 2017 letter, uses the exact

21   word used in the Ohio State question.  I would like to think

22   this is out of character for me, but I feel like this was

23   evidence that just wasn't forthcoming.

24           As I mentioned, I think the action taken was harsh, but

25   oftentimes action that's justified is harsh.  It's very

1  unfortunate someone spent almost two years towards academic

2  achievement that has no value now. I think, though, the real

3  question, in the Court's view, is was this justified by the

4  university and does the plaintiff have a substantial likelihood

5  of success on showing that he was truthful on the application

6  form and that he was, in fact, not under disciplinary charges.

7  I don't think from the evidence I've heard in this case that I

8  can find that to be credible.

9        There also is the potential of harm to third parties

10 which is a factor I'm to consider in deciding whether a

11 temporary restraining order should issue. I'm always cognizant

12 of the fact that a constitutional violation almost always would

13 result in temporary relief, but there are two issues raised

14 under the Fourteenth Amendment which incorporates the Fifth

15 Amendment requirement of due process. The first is procedural

16 due process. I believe that there has been all the process due

17 that has been exercised in this case by Ohio State.

18       With regard to substantive due process and the issue of

19 vagueness, there are two paths that leads to. One is an

20 as-applied challenge. I think given the facts in this case and

21 the narrowness of the decision made by Ohio State, that there

22 is no as-applied issue here.

23       As to a claim that the regulations are unconstitutional

24 on their face, then I have to conclude that a reasonable

25 construction of those regulations could not lead to a

1    constitutional interpretation, and I do not find that.

2          So with these factors in mind, it will be the decision

3    of the Court to deny the application for a temporary

4    restraining order.

5          Are there any other matters before we recess?

6             MR. ROSENBERG:  No, Your Honor.

7             THE COURT:  Thank you very much.

8          With that, we'll be in recess.

9       (Proceedings concluded at 5:20 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

142

1                        - - -

2                  WITNESS INDEX

3                        - - -

4    WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

5    PLAINTIFF's:

6    John Doe                  5       29        54         65

7                        - - -

8                  WITNESS INDEX

9                        - - -

10   WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

11   DEFENDANT'S:

12   Jack Miner               68       99       119        123

13

14

15

16

17

18

19

20

21

22

23

24

25

143

1          C E R T I F I C A T E

2

3          I, Darla J. Coulter, do hereby certify that the

4    foregoing is a true and correct transcript of the proceedings

5    before the Honorable Edmund A. Sargus, Jr., Chief Judge, in the

6    United States District Court, Southern District of Ohio,

7    Eastern Division, on the date indicated, reported by me in

8    shorthand and transcribed by me or under my supervision.

9

10                         s/Darla J. Coulter
                           Darla J. Coulter, RMR, CRR
11                         Official Federal Court Reporter

12

13

14                         April 10, 2019

15

16                              - - -

17

18

19

20

21

22

23

24

25